EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAWN PAULING, next friend of J.P.; ALIYA
MOORE, next friend of the minor children C.J.
and T.M.; TAMIKA BILLS, next friend of the
minor D.B.; DOROTHEA NICHOLSON
next friend of the minors D.W. and A.W.;
SHERRY LAWRENCE, next friend of the
minor S.L.; LOUISE HAMM, next friend of the
minor N.H.;EILEENE GORDON-KING, next
friend of the minor A. G-T.; ELENA HERRADA,
next friend of the minors M.G. and F. G.;
DAVON HARRELL; The PUBLICLY-ELECTED
DETROIT PUBLIC SCHOOLS BOARD, and
DR. JOHN TELFORD, all on behalf of the
designated minor Children and as REPRESENTATIVES
of the CLASS of ALL CHILDREN OF THE
DETROIT PUBLIC SCHOOLS FROM 2011 TO THE
PRESENT

**CLASS ACTION**

Case No.
Hon.
Magistrate

Plaintiffs,

v.

RICK SNYDER, individually, and in his
Official Capacity as Governor of the
State of Michigan, PHILLIP PAVLOV,
individually, and in his Official Capacity
as a Senator in the Michigan Senate,
AL PSCHOLKA, individually, and in his
Official Capacity as a Representative
in the Michigan House of Representatives,
ROY S. ROBERTS, individually and in his
respective Official Capacity as an
Emergency Manager of the Detroit
Public Schools, JACK MARTIN, individually
and in his respective Official Capacity as an
Emergency Manager of the Detroit Public Schools,

DARNELL EARLEY, individually and in his
respective Official Capacity as an
Emergency Manager of the Detroit
Public Schools, BARBARA BIRD-BENNETT,
individually, and in her Official
Capacity in the Detroit Public Schools,
NORMAN SHY, individually and as
owner of ALLSTATE SALES, ALLSTATE
SALES, a Michigan Corporation, CLARA
FLOWERS, individually, and in her
Official Capacity in the Detroit
Public Schools, TANYA BOWMAN
individually, and in her Official
Capacity in the Detroit Public
Schools, RONALD ALEXANDER
individually and in his Official
Capacity in the Detroit Public Schools,
JOSETTE BUENDIA individually and
in her Official Capacity in the
Detroit Public Schools, BEVERLY
CAMPBELL individually and in her
Official Capacity in the Detroit
Public Schools, NINA GRAVES-HICKS
individually and in her Official
Capacity in the Detroit Public
Schools, JAMES HEARN individually
and in his Official Capacity in
the Detroit Public Schools, GERIMA
JOHNSON individually and in her
Official Capacity in the Detroit
Public Schools, STANLEY JOHNSON
individually and in his Official
Capacity in the Detroit Public
Schools, TIA'VON MOORE-PATTON
individually and in her Official
Capacity in the Detroit Public Schools,
WILLYE PEARSALL individually and
in his Official Capacity in the
Detroit Public Schools, RONNIE SIMS
individually and in her Official
Capacity in the Detroit Public
Schools, CLARA SMITH individually
and in her Official Capacity in
the Detroit Public Schools,
KENYETTA WILBOURN SNAPP individually
and in her Official Capacity in

the EAA, GLYNIS THORNTON individually
and as the owner of MAKING A
DIFFERENCE EVERYDAY, MAKING A DIFFERENCE
EVERYDAY, a Michigan Corporation, and
PAULETTE HORTON,

Jointly and Severally.

     Defendants
_____

THOMAS H. BLEAKLEY, PLLC (P23892)
Attorney for Plaintiffs
21957 Shore Pointe Ln.
St. Clair Shores, MI 48080-2362
(313) 640-9900
Tom@BleakleyLegal.com


_____

## CLASS ACTION COMPLAINT AND DEMAND FOR TRIAL BY JURY

     NOW COME the Plaintiffs, on their own behalf and on behalf of all others

similarly situated, by and through their pro bono counsel, Thomas H. Bleakley, and

complain of the Defendants as follows:

### NATURE OF THE CASE

1.  This is a class action suit brought, in part, under the Equal Protection and

Substantive Due Process Clauses of the Fourteenth Amendment (42 U.S.C. Sec.

1983, U.S. Const. Amend. XIV), section 504 of the Rehabilitation Act of 1973

[29 U.S.C. 794], Title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et

seq.], and the provisions of any other Federal statute prohibiting discrimination by

recipients of Federal financial assistance.

2.  Class members are the 58,000 children, more or less, students of the Detroit

Public Schools (DPS) (including those enrolled in EAA schools) who from 2011

to the present have experienced and will continue to experience serious and

permanent damage caused by Defendants' willful and wanton callous indifference to their educational needs. Class member have been and are presently subjected to the unconstitutional effects[1] and/or application of Michigan's Local Financial Stability and Choice Act; Public Acts of 2012; MCL Sections 141.1541, et. seq. ("Public Act 436") and its predecessor statute Public Act 4.

3. This action seeks compensatory damages for the the entire class of DPS children who have been subjected to constitutional violations arising from the defendants' callous indifference in the creation of and practices resulting from Public Act 436 and Public Act 4. These acts provide that when a state municipality or school district experiences a certain level of financial hardship, the state appoints an un-elected Emergency Manager to "rule by decree" over said jurisdiction, assuming all of the powers and duties of locally-elected legislative and executive officers. Emergency Managers have been appointed under P. A. 436, or its predecessor statute, P.A. 4, over the Detroit Public Schools by defendant Snyder continuously since 2011 to the present.

4. These sweeping Michigan Emergency Manager powers and duties include, but are not limited to, acting "[f]or and in the place and stead of the governing body, . . . [ruling] by decree over cities and villages through powers that permit the emergency manager to contravene and thereby implicitly repeal local laws such as city and village charters and ordinances, . . . explicitly repeal, amend, and enact local laws such as city and village ordinances, . . . [and] sell, lease, convey, assign, or otherwise use or transfer the assets, liabilities, functions, or

---

[1] The constitutional status of P.A. 436 is currently on appeal before the Sixth Circuit Court of Appeals (No. 15-2394, Phillips, et al v. Snyder, et al) from a ruling by the Hon. George C Steeh, 2:13-cv-11370.

responsibilities of the local government. . ." (See, MCL 141.1549(9)(2); MCL

141.1549; MCL 141.1552; MCL 141.1552(12)(1)(r), emphasis added.

5. The defendant Emergency Managers charged with financial reform did not have, nor were they supported by, the necessary expertise to manage non-financial aspects of municipal government, including public school districts.

6. Michigan's Emergency Manager Law and related practices were used to compromise and damage the quality of education received by all DPS students with life-long consequences in the name of financial urgency.

7. The Emergency Manager Law is predicated on the concept that a local financial crisis is due to the inability of local officials to address the problem. In fact, beginning in 1999 the State took over the management of the DPS which was functioning financially 'in the black' and with its student body performing at a level on average with the school districts of the entire state of Michigan and, in the seventeen years since, have turned the district into a virtual financial hell-hole. The EM is supposed to be able to better handle the situation, make better and faster decisions, and resolve the financial crisis, but has done nothing but drive the district downward. The EM law states "[t]hat the fiscal stability of local governments is necessary to the health, safety, and welfare of the citizens of this state and it is a valid public purpose for this state to assist a local government in a condition of financial emergency."

8. The Emergency Manager is deemed necessary not only to resolve the fiscal problem but also to protect the public health and safety. Yet in the case of of the Detroit Public Schools, while other state and local officials were involved,

Emergency Managers undertook and/or established decision-making processes that compromised and damaged the quality of education DPS children received, a critical reason being the loss of accountability and the system of checks and balances that are provided by representative government.

9.   The Emergency Manager statutes both in principle and in practice have had a callously disparate impact on DPS children, most particularly children of color. A majority, 50.4%, of the state's 1,413,320 African American residents are now ruled by unelected Emergency Managers including the Detroit Public Schools and its current proportionality of 87% African American and 7% Hispanic students. Both Public Act 4 and Public Act 436 have been applied in a discriminatory manner. The state has imposed Emergency Managers on cities with majority or near majority African- American populations, even though there were non-African-American cities with the same or worse "Fiscal Health Score," as defined by Defendant State Treasurer. In Oakland County, the state imposed an Emergency Manager on the City of Pontiac, which has an African American population of 52.1%, but the state did not impose an Emergency Manager in the Oakland County cities of Hazel Park (9.8% African American population), and Troy (4.0% African American population), even though each of these cities had an identical Fiscal Health Score of "6." This discriminatory pattern in Oakland County was repeated in other counties throughout the state in violation of the Equal Protection and Substantive Due Process Clauses of the Fourteenth Amendment. (42 U.S.C. Sec. 1983, U.S. Const. Amend. XIV).

10.   Further, the Michigan Constitution grants to its citizens the right to vote, on equal

terms, to all qualified electors in local, state and Federal elections, (Const. 1963, Art. II, § 1), and proscribes an equal framework for local self-governance (Const. 1963, Art. VII, Sec. 22); and it is axiomatic that once the state grants "[t]he right to vote on equal terms, the State may not by later arbitrary and disparate treatment, value one person's vote over that of another." League of  Women Voters v. Brunner, 548 F. 3d 616 (6th  Cir. Ohio 2008)(citing headnote 4, Bush v. Gore, 531 U.S. 98 (2000)).

11.     Emergency Managers have unconstitutionally exercised powers and duties exclusively reserved for locally-elected branches of Michigan government including the Detroit Public Schools, thereby degrading the electorate's right to vote, in Emergency Manager jurisdictions where their elected officials only have advisory authority, as compared to the electorate in non-Emergency Manager jurisdictions, where their officials exercise their full powers and duties. Accordingly, the ballots cast by citizens in non-Emergency Manager jurisdictions are of a higher value than the ballots cast by citizens ruled by Emergency Managers. The voters in the Detroit Public Schools, under emergency managership, lost the right to hold their elected officials accountable, but were instead placed under the control of de facto dictators. These differing standards, which are the direct and proximate result of Public Act 436 and Public Act 4, value one person's vote over that of another, which violates the Fourteenth Amendment's Equal Protection Clause. (42 U.S.C. Sec. 1983, U.S. Const., Amend. XIV; Bush v. Gore, 531 U.S. 98 (2000), supra). Plaintiffs contend, concurrently and alternatively, that P.A. 436

also violates the Equal Protection Clause by debasing and diluting residents' right of vote, Plaintiffs, however, also assert a separate and distinct substantive due process claim.[2]

12.      Moreover, in its haste to approve Public Act 436 during the legislature's 2012 lame duck session, the State, upon information and belief, failed to apply for and obtain either the approval of the Attorney General of the United States, or a declaratory judgment of a panel of the United States District Court for the District of Columbia, "[p]rior to the enactment of any new voting qualification or perquisite to voting, or standard or practice" of voting, such as Public Act 436, which Michigan is required to do since Buena Vista Township and Clyde Township were covered jurisdictions within the State, subject to the preclearance requirements under Section 5 of the 1965 Voting Rights Act. (42 U.S.C. 1973c, and 42 U.S.C. 1973b(a)).

13.      There has been a long-standing and contentious relationship between the State of Michigan and the DPS.  It is of more than historical interest that the seed for the instant litigation was planted more than forty years ago when the U.S. Supreme Court in Milliken v Bradley, 418 US 717 (1974), declined to expand the boundaries of the school district to set aside the separate and inherently unequal educational opportunities afforded DPS children.  At that time. Justice Thurgood

---

[2] This issue is also part of the appeal  in Phillips, et al v. Snyder, et al as set forth in footnote 1 supra.

Marshall predicted the long-term impact of the Court's decision on future children of the Detroit Public Schools in his dissent. "[T]he Court today takes a giant step backwards. Notwithstanding a record showing widespread and pervasive racial segregation in the educational system provided by the State of Michigan for children in Detroit, this Court holds that the District Court was powerless to require the State to remedy its constitutional violation in any meaningful fashion. Ironically purporting to base its result on the principle that the scope of the remedy in a desegregation case should be determined by the nature and the extent of the constitutional violation, the Court's answer is to provide no remedy at all for the violation proved in this case, thereby guaranteeing that Negro children in Detroit will receive the same separate and inherently unequal education in the future as they have been unconstitutionally afforded in the past." (Id at 782)

14.     To paraphrase Justice Marshall, since 2011 the unconstitutional acts or omissions of the defendants in creating and/or carrying out the dictates of Public Act 4 and Public Act 436 complained of herein have moved the educational status of DPS children another "giant step backward." by egregiously aggravating and compounding the long-standing existing inherently unequal educational status of DPS children that has resulted in lifelong consequences to the children.

15.     The Michigan Constitution specifically notes the importance of education to a well-ordered society: "Religion, morality and knowledge being

necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." MICH CONST (1963), art I, §1. As such, "The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin." MICH CONST (1963), art I, §2.

16.     The importance of education to a democratic society has also been addressed by the U.S. Supreme Court: [N]either is [education] merely some governmental "benefit" indistinguishable from other forms of social welfare legislation. Both the importance of education in maintaining our basic institutions, and the lasting impact of its deprivation on the life of the child, mark the distinction. The "American people have always regarded education and [the] acquisition of knowledge as matters of supreme importance. We have recognized "the public schools as a most vital civic institution for the preservation of a democratic system of government," and as the primary vehicle for transmitting "the values on which our society rests." "[A]s . . . pointed out early in our history, . . . some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence. And these historic "perceptions of the public schools as inculcating fundamental values necessary to the maintenance of a political

10

system manager have been confirmed by the observations of social scientists." In addition, education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. In sum, education has a fundamental fabric of our society. We cannot ignore the significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests. In addition to the pivotal role of education in sustaining our political and cultural heritage, denial of education to some isolated group of children poses an affront to one of the goals of the Equal Protection Clause: the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit. Plyer v. Doe, 457 U.S. 202, 221 (1982) (citations and quotations omitted).

17.    The Due Process Clause of the U.S. Constitution guarantees that an individual will not be deprived of life, liberty, or property without due process of law. US CONST amend V. Furthermore, under the Fourteenth Amendment, no one may be "deprived of life, liberty or property without due process of law" nor be denied equal protection of the laws. US CONST amend. XIV, § 1.

18.    Similarly, the Michigan Constitution ensures: No person shall . . . be deprived of life, liberty or property, without due process of law. Mich. Const (1963), art I, §17. 997).

19.    These constitutional provisions serve to protect citizens, including

poverty-stricken DPS children, from the deprivation of fundamental rights—those rights specifically identified in the Constitution or principles of justice so rooted in the tradition and conscience of our people as to be ranked as fundamental and therefore implicit in the concept of ordered liberty. See e.g., Washington v. Glucksberg, 521 U.S. 702, 721. For the first time in our nation's history, Michigan through P.A. 4 and P.A. 436 has revoked elections for local legislative officers in favor of political appointees, who possess the full scope of local legislative power. Michigan's experiment infringes a fundamental right and violates substantive due process because it is not narrowly tailored to a compelling state interest and because it establishes a system that is fundamentally unfair.

20.     In their treatment of the educational needs of the children of DPS, defendants have created, by passage of P.A. 436 and its predecessor statutes P.A. 4. and/or pursued a pattern of acts or failures to act in depraved and callous indifference to the constitutionally protected rights of DPS children.

21.     Defendants' pattern of depraved and callous indifference with regard to the educational needs of DPS children were and are intentional and/or grossly negligent in a manner that has grievously harmed the children of the DPS with lifelong consequences. Furthermore, the defendants have intentionally and/or with wanton and reckless disregard for the constitutional rights of DPS children inflicted emotional distress on the children.

## JURISDICTION and VENUE

22.     This Court has jurisdiction over this action pursuant to Title 28 U.S.C. §§1331 and 1343(3) in that the controversy arises under the United States Constitution and federal statutes 42 U.S.C. §1983 and 28 U.S.C. §§2201 and 2202.  Plaintiff further invokes the supplemental jurisdiction of this Court under 28 U.S.C. §1367(a) to hear and adjudicate state law claims. All acts or omissions alleged herein were done by defendants individually or in their representative capacities on behalf of the State of Michigan, or their officers, agents, and employees, acting under color and pretense of the statutes, ordinances, regulations, customs and usages of the State of Michigan and the United States.

23.     Venue is proper in this district under 28 U.S.C. §1391(b) because a substantial part of the events giving rise to the claims in this action occurred in this district and all plaintiffs are residents of the city of Detroit County of Wayne, State of Michigan.

## PARTIES

**Plaintiffs**

24.     Plaintiff DETROIT PUBLIC SCHOOLS BOARD is the duly publicly-elected entity entrusted by the citizens of the City of Detroit to act with accountability, subject to the checks and balances of a free society, in the best interests of the children of the Detroit Public Schools and DOCTOR JOHN

TELFORD was duly appointed by the BOARD to act with accountability, subject to the checks and balances of a free society, in the best interests of the children of the Detroit Public Schools as Superintendent of the school district, in the City of Detroit, County of Wayne, State of Michigan.  These Plaintiffs bring this lawsuit together with the named parent next friends on behalf of the designated representative minor children and all children enrolled in the Detroit Public Schools from 2011 to the present time who were subjected to the callous indifference of their constitutional rights by one or more of the named defendants herein, acting jointly and severally as individuals, and/or in their representative capacities under color of state law.

25.     ALIYA MOORE is the natural parent and next friend of TW, a child in the first grade, and CJ, a child in the eighth grade at Paul Robinson/Malcolm X elementary school and brings this lawsuit on said children's behalf, individually, and on behalf of the class of plaintiffs herein identified as children enrolled in the Detroit Pubic Schools from 2011 to the present time.

26.     TAMIKA BILLS is the natural parent and next friend of DB, a student in the tenth grade at Communication/Media Arts and bring this lawsuit on said child's behalf individually, and on behalf the class of plaintiffs herein identified as children enrolled in the Detroit Pubic Schools from 2011 to the present time.

27.     Additional named plaintiffs are DPS 4th grader DW$^3$, by her next friend DOROTHEA NICHOLSON, DPS 5th grader SL, by her next friend SHERRY LAWRENCE, Special Education student JASON PAULING by his next friend DAWN PAULING, Special Education student AG-T by his next friend EILEENE GORDON-KING, Special Education 8th grade students MG and FG at Golightly by their next friend ELENA HERRADA, student NH by his next friend LOUISE HAMM, and former DPS non-graduate student DAVON HARREL all individually and on behalf of the class of plaintiffs herein identified as children enrolled in the Detroit Pubic Schools from 2011 to the present time.

28.     All plaintiff-parents are residents of the City of Detroit, County of Wayne, State of Michigan.

**Class Action Requisites**

29.     The class of DPS children is so numerous that joinder of all class members is impracticable. There are currently 47,000 children, more or less, enrolled in the Detroit Public Schools and approximately 11,000 children more or less, former DPS students, now in the EAA. Thousands of other children have left the DPS since 2011 either through graduation, dropping out and/or transferring to other non-DPS schools.

---

3The names of the designated next friend parents' minor children are redacted per local court rule to protect the identities of said children.

30.      There are questions of law and fact common to the class of DPS children in that they have all been subjected to the same policies and procedures of callous and depraved indifference foisted upon them by the defendants herein.

31.      The class representatives will fairly and adequately protect the interests of the class as Plaintiffs School Board and Telford, by virtue of their past accountability, adherence to the systems of checks and balances of a free society, and continuing dedication to DPS children, are especially well-qualified and dedicated as residents of Detroit to act in a manner beneficial to the interests of the class members. Plaintiff parents as next friends on behalf of their minor children will also fairly and adequately protect the interests of the class as their claims are typical of each member of the class. Plaintiffs' Counsel is unaware of any conflicts of interest between the class representatives and absent class members with respect to the matters at issue in this litigation. The class representatives will vigorously prosecute the suit on behalf of the Class, and the Class representatives are represented by experienced counsel who has substantial experience and expertise in complex litigation involving personal and property damage.

32.      The number of class members is sufficiently numerous to make class action status the most practical method for Plaintiffs to secure redress for injuries sustained.

33.      There are questions of law and fact common to the class of DPS and

16

EAA children in that each of the 58,000 children, more or less, in the DPS and EAA have been subjected to the same callous indifferent policies and procedures foisted upon them by the defendants acting under color of state law.

34.     The claims of the class representatives are typical of and common to all members of the class in the following ways;

a.    The designated minor plaintiffs and all other members of the class are and/or were students in the DPS or EAA during the time period when control of the educational policies and practices were under the control of the defendant emergency managers acting under color of state law.  Typical students in Detroit:

1. Attend a school where <u>classrooms are overcrowded,</u>

2. Are exposed to <u>non certified teachers</u> during their K-12 experience,

3. Do not have access to <u>instructional technology</u> on a daily basis in their classroom,

4. Are not <u>college or career ready</u> at graduation,

5. Do not <u>read at grade level</u> at any point in their K-12 experience,

6. Do not learn <u>basic numeracy,</u>

7. Are seriously <u>undereducated (miseducated)</u> at graduation (if they do graduate),

8. Are mainly African-American or Hispanic,

9. Are at <u>higher risk to drop out</u> of School,

10.  Are at <u>higher risk to never qualify to attend post secondary education</u>,

11.  Are at <u>higher risk to become incarcerated</u>,

12.  Are more likely to remain in <u>poverty or underperform economically</u>,

13.  Attend an <u>economically or racially segregated school</u>, and

14.  Are more likely to have teachers not certified or trained in critical areas like math.

b.  Attributes of Commonality among this class of children include:

1. <u>Emergency Manager control of academics</u>, loss of public accountability and systems of checks and balances,

2. Diversion of Title 1 and other federal funds away from classroom resources (computers, textbooks, tutoring, etc.),

3.  Inadequate resources (instructional technology, textbooks, tutoring, etc.),

4.  Inadequate support for resources that expand access to curriculum,

5.  Academic decisions not data driven,

6.  Academic Leadership by non-academic managers

.

35.  Based on generally accepted scientific methodology, the designated representative minor plaintiffs, together with all members of the class, have experienced a predominant statistically significant decrease in educational performance during this time period as measured by mandatory statewide

testing.

36.     Common question of law and fact susceptible to class-wide resolution exist

with respect to every member of the class, including class representatives, such

as whether the conduct of defendants as enumerated herein in this complaint

was the proximate cause of the predominant statistically significant decrease in

educational performance, and whether the constitutional rights of each member

of the class, including the representative minor children, were violated by the

defendants.

37.     Each child in the class, including the named representative minor plaintiffs,

could rely on the demonstrated statistical significance of decreased educational

performance levels if she or he brought an individual action.

38.     Prosecution of separate actions risks inconsistent adjudications that would

establish incompatible standards of conduct for the defendants. Further, this

court would be incapable of processing the thousands of individual claims of

the DPS children.

**Defendants**

39.     Defendant RICK SNYDER is the Governor of the State of Michigan and this

lawsuit is brought against him, individually, and in his official capacity.

Defendant Snyder is a resident of the city of Ann Arbor, County of Washtenaw,

State of Michigan.

40.     Defendant PHILLIP PAVLOV is a Senator in the Michigan Senate and the

sponsor of Senate Bill 0865 that became Public Act 436 of 2012.  This lawsuit is brought against him, individually, and in his official capacity. Defendant Pavlov is a resident of St. Clair Township, County of St. Clair, State of Michigan.

41.   Defendant AL PSCHOLKA is a Representative in the Michigan legislature and the sponsor of Public Act 4 (2011) and of House Bill 4214 that became Public Act 436 of 2012. This lawsuit is brought against defendant Pascholka, individually, and in his official capacity. Defendant Pscholka is a resident of Lincoln Township, County of Berrien, State of Michigan.

42.   Defendant ROY S. ROBERTS was an emergency manager of the Detroit Public Schools from 2011 through April 13, 2013 and this lawsuit is brought against him individually and in his official capacity. Defendant Roberts is a resident of the City of Bloomfield Hills, County of Oakland, State of Michigan.

43.   Defendant JACK MARTIN was an emergency manager of the Detroit Public Schools from April 13, 2013 until 2015 and this lawsuit is brought against him individually and in his official capacity. Defendant Martin is a resident of the City of Birmingham, County of Oakland, State of Michigan.

44.   Defendant DARNELL EARLEY was an emergency manager of the Detroit Public Schools from 2015 to March 1, 2016. Defendant Earley was the most recent Emergency Manager appointed by defendant Snyder for Detroit Public

Schools under the authority granted by MCL §141.1541 et seq. He came to Detroit after leaving the City of Flint a disaster area where he also acted as an Emergency Manager. Defendant Earley is a resident of the Charter Township of Delta, County of Eaton, State of Michigan.

45.     Defendant BARBARA BYRD-BENNETT is a former Detroit Public School official who is a resident of the City of Solon, County of Cuyahoga, State of Ohio.

46.     Defendant NORMAN SHY was the owner of Defendant ALLSTATE SALES, a company that was included on DPS' approved vendor list. Defendants SHY and ALLSTATE SALES both conducted business in the City of Detroit, County of Wayne, State of Michigan. Defendant Shy is a resident of the City of Franklin, County of Oakland, State of Michigan.[4]

47.     Defendant CLARA FLOWERS was an employee and agent of DPS employed from 2011 to 2014 as Principal of Henderson Academy and then employed as Assistant Superintendent of DPS's Office of Specialized Students Services under the supervision of Defendants Roberts, Martin and/or Earley.

48.     Defendant TANYA BOWMAN was an employee and agent of DPS employed as Principal of Osborn Collegiate Academy of Mathematics, Science and

---

[4] Defendants Norman Shy, Clara Flowers, Tanya Bowman, Ronald Alexander, Josette Buendia, Beverly Campbell, Nina Graves-Hicks, James Hearn, Gerima Johnson, Stanley Johnson, Tia'Von Moore-Patton, Willye Pearsall, Ronnie Sims, and Clara Smith were all recently indicted for illegally paying or accepting kickbacks for issuing/or use of of fraudulent vouchers . Each defendant's case was assigned to a separate Eastern District Judge.

Technology from 2010 through 2014 under the supervision of Defendants Roberts, Martin and/or Earley.

49.     Defendant RONALD ALEXANDER was an employee and agent employed as a Principal of Spain Elementary-Middle School from 2011 through 2014 under the supervision of Defendants Roberts, Martin and/or Earley.

50.     Defendant JOSETTE BUENDIA was an employee and agent employed as a Principal of a DPS school from 2011 through 2014 under the supervision of Defendants Roberts, Martin and/or Earley.

51.     Defendant BEVERLY CAMPBELL was an employee and agent employed as a Principal of a DPS school from 2011 through 2014 under the supervision of Defendants Roberts, Martin and/or Earley.

52.     Defendant NINA GRAVES-HICKS was an employee and agent employed as a Principal of a DPS school from 2011 through 2014 under the supervision of Defendants Roberts, Martin and/or Earley.

53.     Defendant JAMES HEARN was an employee and agent employed as a Principal of a DPS school from 2011 through 2014 under the supervision of Defendants Roberts, Martin and/or Earley.

54.     Defendant GERIMA JOHNSON was an employee and agent employed as a Principal of a DPS school from 2011 through 2014 under the supervision of Defendants Roberts, Martin and/or Earley.

22

55.     Defendant STANLEY JOHNSON was an employee and agent employed as a Principal of a DPS school from 2011 through 2014 under the supervision of Defendants Roberts, Martin and/or Earley.

56.     Defendant TIA'VON MOORE-PATTON was an employee and agent employed as a Principal of a DPS school from 2011 through 2014 under the supervision of Defendants Roberts, Martin and/or Earley.

57.     Defendant WILLYE PEARSALL was an employee and agent employed as a Principal of a DPS school from 2011 through 2014 under the supervision of Defendants Roberts, Martin and/or Earley.

58.     Defendant RONNIE SIMS was an employee and agent employed as a Principal of a DPS school from 2011 through 2014 under the supervision of Defendants Roberts, Martin and/or Earley.

59.     Defendant CLARA SMITH was an employee and agent employed as a Principal of a DPS school from 2011 through 2014 under the supervision of Defendants Roberts, Martin and/or Earley.

60.     Defendant KENYETTA WILBOURN SNAPP was an employee and agent employed as a Principal of an EAA school from 2013 through 2014 under the supervision of Defendants Roberts, Martin and/or Earley.

61.     Defendant GLYNIS THORNTON was the owner of Defendant MAKING A DIFFERENCE EVERYDAY, a DPS vendor offering purported

23

tutoring services to children of the DPS/EAA in the City of Detroit, County of Wayne, State of Michigan.

62.     Defendant PAULETTE HORTON was an 'independent contractor' operating between defendants SNAPP and THORTON and/or on behalf of defendant MAKING A DIFFERENCE EVERYDAY to make bribery payments to SNAPP from THORTON in the City of Detroit, county of Wayne, State of Michigan.

63.     Defendant MAKING A DIFFERENCE EVERYDAY was a vendor offering purported tutoring services to children of the DPS/EAA that were funded by local, state and federal taxpayer monies.

## FACTUAL ALLEGATIONS

Plaintiffs re-allege and re-plead all the allegations of the preceding paragraphs of this Complaint and incorporate them herein by reference.

64.   All defendants as individuals and in their official capacities at all times pertinent to this litigation were purporting to be operating under color of state law. Each and all of the acts or omissions alleged herein were done by defendants, or their officers, agents, and emergency managers, under color and pretense of the statutes, ordinances, regulations, customs and usages of the State of Michigan.

65.   After the Bradley decision in 1974 until 1999, the DPS operated under the direction of an elected Board that took "small, often difficult steps" in attempts

to rise above and move past the inherited separate and inherently unequal educational status afforded to the district by Milliken.  The elected Board of DPS operated satisfactorily within that framework with these inherent limitations until the initial takeover by the State in 1999.

66.   In 1994, the voters of Detroit approved a $1.5 billion Bond for school repairs and new buildings. The number of children enrolled in the DPS in 1994 was 167,551 and rising.

67.   In 1999 DPS had an enrollment of 173,848 students. In 1999, the DPS enjoyed a ninety-three million dollar surplus, 1.2 billion dollars in bond money remaining from a 1.5 billion dollar bond for school repairs and new buildings that was approved by voters in 1994. Students of DPS were testing at levels equivalent to other students in the State of Michigan.

68.   In 1999 the State of Michigan took over control of the running of the Detroit Public Schools (DPS) and aside from a brief three-year period (2007-2009) the state has controlled the DPS to the present time.

69.  In 1999 David Adamany, the first Reforms CEO reported to the Michigan Legislature that the DPS was the number one performing school district in the nation with a population above 100,000 students where the majority were receiving free and reduced-cost lunches. The DPS had 40 schools where over 80% of its students tested at or above national levels. Detroit had more

nationally certified teachers than any other school district in the State and teaching professionals from around the nation came to Detroit to learn what and how to teach.

70.  Under state control by 2005 the district had a $48.7 million deficit and enrollment had declined to 141,185 students.

71.  When the district was returned to the Board of Education (2007), the district had a $1.1 million deficit and student enrollment had declined to 113,394, the enrollment loss alone creating a $400 million loss of revenue. After nearly seven years of state control, the schoolchildren had regressed in test scores at all grade levels.

### Legislative History of the State Takeover of the Detroit Public Schools

72.   In 1988, the state enacted Public Act 101 of 1988 (PA 101). Public Act 101 allowed the state to intervene when local municipalities were found to be in financial distress. The statute allowed the state to appoint emergency financial managers over cities experiencing a financial emergency.

73.   In 1990, the legislature passed the Local Government Fiscal Responsibility Act, Act No. 72, Public Acts of 1990 (PA 72). Public Act 72 authorized state officials to intervene when local governments face a financial emergency.

74.  Pursuant to P.A. 72, Michigan's local financial emergency review board could appoint an emergency financial manager (EFM) only after the Governor

declared a financial emergency within the local government.

75.   Under P.A .72, local elected officials were not removed from office and the EFM's powers only extended to matters of finance. Their powers did not extend to purely administrative or policy matters. Furthermore, EFMs had the power to renegotiate, but not unilaterally break contracts. By legislative edict, the only background required of an EFM was five years of business experience.

76.   Following elections in November of 2010 and the turnover of state offices in January 2011, the Michigan legislature introduced House Bill 4214 (2011) sponsored by Defendant Pscholka on February 9, 2011. The bill was a response to a court ruling finding that the Detroit Public Schools' School Board, and not the EFM, possessed the power under P.A. 72 to determine what curriculum would be taught and which texts would be used in the city's public schools. Wayne County Circuit Court Judge Wendy Baxter had determined that the EFM had irreparably damaged the DPS as a result of interference in matters well beyond the scope of his statutory powers. The decision provoked defendant Pscholka and the state legislature to seek greater control over the content of the curriculum taught in Detroit's schools by legislative edict.

**Michigan Voters Directly Rejected Emergency Manager Governance**

77.   The Michigan legislature passed and the defendant Snyder signed into law Public Act 4 which became effective immediately upon passage on March 16, 2011. Public Act 4 allowed the Defendant Dillon as state treasurer to conduct a

financial review of a local government or school district if in his sole discretion he finds facts or circumstances indicative of financial stress

78. Public Act 4 allowed non-elected emergency managers to preside over local jurisdictions and to assume the powers and duties of elected officials, upon a finding of financial distress.  (Public Act 4, supra). At all times relevant to this litigation the 'financial distress,' in part, was being caused by the funneling of local, state and federal taxpayer monies away from educational use by the bribery schemes being perpetrated by the defendant principles of DPS/EAA and defendant vendors.

79.  Michigan's Emergency Manager law (Public Act 4), was repealed by Michigan voters in the November 6, 2012 general election. The question squarely on the ballot was whether to repeal Public Act 4, the Local Government and School District Fiscal Accountability Act ("Public Act 4"), the emergency manager law which preceded Public Act 436. Public Act 4 was preceded by Public Act 72, the Local Government Fiscal Responsibility Act, Act No. 72, Public Acts of 1990 ("Public Act 72"). Both Public Acts 4 and 72 were forms of governance by Emergency Manager which diminished the authority of local officials upon a state determination of municipal financial distress.

80.  In Michigan, the emergency manager issue was not some obscure ballot question in the November 6, 2012 general election. The issue was highly publicized by

the Michigan and national press, and well-known to the state's voters because of the fierce political and legal battle that had been waged in courts of law and in the court of public opinion. The ballot question committee known as Stand Up for Democracy coordinated the circulation of petitions, collecting 226,339 petition signatures and filing same in 50 boxes with the Michigan Secretary of State's Office.

81. The State Board of Canvassers, the body charged with reviewing the petitions, did not accept the petitions, having deadlocked by a vote of 2-2, along a straight party-lines, with the two Republican appointees to the tribunal voting to defy its own staff report, its own expert witness from Michigan State University, and sworn testimony and a printer's affidavit from one of the state's most respected printers, and in defiance of their own eyes, erroneously concluding that the type size of the petition heading was not 14-point bold type as required by statute.

82. Stand Up for Democracy filed an appeal of the Board of Canvassers' decision via a Writ of Mandamus in the Michigan Court of Appeals. The Court of Appeals heard oral argument on May 17, 2012. On June 8, 2012 the Court issued a per curiam ruling in this matter stating that "Plaintiff does not have an alternate legal remedy. The elements of mandamus thus have been met and we direct the Board [of Canvassers] to certify plaintiff's petition for the ballot." Stand Up for Democracy v. Board of State Canvassers, MI Crt. App, No. 310047 (6/6/12,

Opinion, at 18).

83. Challenger Citizens for Fiscal Responsibility filed for leave to appeal to the Michigan Supreme Court. Leave was granted. Defendant Snyder and the State's Attorney General filed amici briefs in support of the challengers' position.

84. After having heard oral argument, the Michigan Supreme Court, on August 3, 2012, in a 4 to 3 ruling, rejected the challengers' position, and held that the petitions were in actual compliance with state law and the issue was ordered on the ballot. The Court held, "The Board of State Canvassers shall certify the petition as sufficient because a majority of the Court concludes that plaintiff either actually complied with the law or that the Court of Appeals' original writ of mandamus was not erroneous." Stand Up for Democracy v. Secretary of State, Mich. S. Ct. No. 145387, at 28 (Aug. 3, 2012).

85. The Board of Canvassers thereafter unanimously (4-0) approved the petitions as ordered by the Supreme Court, and its staff developed language, in consultation with both parties, to be presented to the voters. The agreed-upon language for the state-wide ballot on whether or not to repeal Public Act 4 was as follows:

"PROPOSAL 12-1
A REFERENDUM ON PUBLIC ACT 4 OF 2011 – THE
EMERGENCY MANAGER LAW

Public Act 4 of 2011 would:

- Establish criteria to assess the financial condition of local government units, including school districts. Authorize   Governor   to appoint an emergency manager (EM) upon state finding of a financial emergency, and allow the EM to act in place of local government officials.

- Require EM to develop financial and operating plans, which may include modification or termination of contracts, reorganization of government, and determination of expenditures, services, and use of assets until the emergency is resolved.

- Alternatively, authorize state-appointed review team to enter into a local government approved consent decree.

Should this law be approved?

YES_ NO____ "

86. Press coverage of the legal battle over the petitions ("Fontgate") and the Supreme Court's ultimate ruling to allow voters access to the ballot on the Emergency Manager question was intensive. The voters well understood the issue.

87. Michigan law provides that measures certified for referendum are suspended until the outcome of the election. MCL Sec. 168.477(2). The State Attorney General issued an Opinion that while Public Act 4 was suspended pending the results of the election, Public Act 72 would take its place, even though, under Michigan law, Public Act 4 had expressly repealed Public Act 72. (Mich. Att'y Gen'l., Opinion No. 7267, August 6, 2012

88. Proposal 12-1, the referendum on the emergency manager law, was decisively

defeated at the polls by the Michigan electorate, by a margin of 53% (No) to 47% (Yes), with a total of 2,370,601 ballots cast in opposition. Michiganders made it plain, having been well- informed, and during a Presidential election year, when voter attentiveness and voter turnout were at their highest, that they did not want an emergency manager law.

**State Legislature Overrides Vote of Electorate**

89.   In utter contempt, brazen arrogance, and callous disregard for the will of the Michigan voters who had just rejected Public Act 4, defendant Al Pscholka, acting individually and in his representative capacity, submitted a House Bill and defendant Phillip Pavlov, acting individually and in his representative capacity, submitted Senate Bill 4214. By December 12, 2012 the bills submitted by defendants Pavlov and Pscholka, culminated in PA 436 which was passed during a lame duck session in the State Legislature. Both defendants acted with callous indifference to the constitutional rights of Michigan citizens, including the children of the Detroit Public Schools. As a result, the Michigan Legislature enacted, and defendant Snyder, acting with callous indifference to the rights of, among other, the children of the DPS, signed, Public Act 436 on December 26, 2012, only fifty days after Michigan voters had soundly rejected P. A. 4.

90.    Public Act 436 largely reenacted the provisions of Public Act 4, the law that Michigan citizens had just revoked to expressly eliminate emergency managers

in the State of Michigan.

91.   In enacting Public Act 436, defendants Pavlov, Pscholka and the Michigan Legislature included a minor appropriation provision, obviously to stop and prevent Michigan voters from putting Public Act 436 to a referendum. Further, an amendment to allow freedom of information access to these actions was rejected by the legislature.

92.   The new law, Public Act 436, took effect on March 28, 2013.

93.   Public Act 436 provides, in pertinent part, as follows:

> "[Emergency Managers are] selected and appointed solely at the discretion of the Governor."
> MCL 141.1549
>
> "Upon appointment, an emergency manager shall act for and in the place and stead of the governing body and the office of chief administrative officer of the local government. . . Following appointment of an emergency manager and during the pendency of receivership, the governing body and the chief administrative officer of the local government shall not exercise any of the powers of those offices except as may be specifically authorized in writing by the emergency manager or as otherwise provided by this act and are subject to any conditions required by the emergency manager." MCL 141.1549(9)(2)"Explicitly repeal, amend, and enact local laws such as city and village ordinances."
> MCL 141.1549 and 141.1552.
>
> "Rule by decree over cities and villages through powers that permit the emergency manager to contravene and thereby implicitly repeal local laws such as city and village charters and ordinances."
> MCL 141.1552
>
> "Subject to section 19, if provided in the financial and operating plan, or otherwise with the prior written approval of the governor or his or

her designee, sell, lease, convey, assign, or otherwise use or transfer
the assets, liabilities, functions, or responsibilities of the local
government. . ."
MCL 141.1552(12)(1)(r).

"For municipal governments, with approval of the governor,
disincorporate or dissolve the municipal government and assign its
assets, debts, and liabilities as provided by law. The disincorporation
or dissolution of the local government is subject to a vote of the
electors of that local government if required by law."
MCL 141.1552(12)(cc).

"Exercise solely, for and on behalf of the local government, all other
authority and responsibilities of the chief administrative officer and
governing body concerning the adoption, amendment, and
enforcement of ordinances or resolutions of the local government . . ."
MCL 141.1552(12)(dd).

94.   Like Public Act 4 before it, Michigan's Public Act 436, is stunning in its

      evisceration of voting rights.

95.    Public Act 436 again changed the title of existing P.A. 4 "emergency

      financial managers" to "emergency managers" and again expanded the

      scope of their powers to cover all the conduct of local government. Once

      again, the requirements of the emergency required no academic or

      educational qualification, but just five years of business or financial

      experience. The Act specifically stated "Sec. 9(a) The emergency

      manager shall have a minimum of 5 years' experience and demonstrable

      expertise in business, financial, or local or state budgetary matters. In

      other words, if an emergency manager was appointed to run a school

district with such minimal qualifications, such a person would be totally

unqualified and/or incompetent to deal with educational issues.

96.   The PA 436 emergency manager's dictator-like powers were

substantially identical to the powers that had been rejected by the

electorate in PA 4. Just five weeks earlier.  Public Act 436 emergency

managers were empowered to fully act "for and in the place of" the

municipality's governing body. The grant of powers again includes a

general grant of legislative power to emergency managers, i.e., the type

of power exercised by dictators in non-democratic areas of the world.

The 24 dictatorships of the world are listed below. Some of the countries

listed, like the State of Michigan, are ruled by more than one form of

government. This is especially true of countries that have different ruling

bodies in various regions. Although the country may not be ruled

completely by a dictatorship, some of the states or specific regions are.

Countries ruled by dictators have a long history of instability and poor

social control. As defendant Snyder's own Task Force on the Flint Water

crisis noted, with an emergency manager in place, the absence of the

democratic requirements of public accountability and checks and

balances was a major factor in causing the crisis. The callously

indifferent disregard of minor plaintiffs' constitutional rights by

defendants **Snyder** and his appointed emergency managers allows

Michigan to lead the list;

- The State of Michigan
- Belarus
- Cameroon
- Chad
- China
- Cuba
- Egypt
- Equatorial Guinea
- Eritrea
- Ethiopia
- Iran
- Kazakhstan
- Libya
- Madagascar
- Myanmar
- North Korea
- Rwanda
- Sudan
- Syria
- Tunisia
- Turkmenistan
- Uzbekistan
- Vietnam
- Zimbabwe

97.    Along with the general grant of legislative power to emergency managers,

Public Act 436 exempted the EM from following existing city charters and

local ordinances, i.e., the type of power exercised by dictators in non-

democratic areas of the world.

98.     PA 436 did not provide any process that emergency managers must follow in

the adoption or repeal of local laws, but rather permitted the emergency manager to do so by private orders, not subject to open meetings requirements. As mentioned above, an attempt to amend the language off PA 436 to permit access to records under the Freedom of Information was rejected by the State Legislature.

99. Public Act 436 also stated that an emergency appointed under PA 4 and an emergency financial manager appointed under PA 72 shall be considered an emergency manager under PA 436 when the new law took effect.

100. Under PA 436, the DPS EM would serve at the pleasure of defendant Snyder and would continue to serve until removed by the Governor or until the Governor finds that the financial emergency has been rectified.

101. Under Public Act 72 Governor Jennifer Granholm had appointed Robert Bobb as Emergency Financial Manager (EFM) over the DPS in January 2009. Bobb, in defiance of his limited statutory role as to financial matters, attempted to exert complete control over the DPS. Wayne County Circuit Court Judge Wendy Baxter issued a ruling finding that the Detroit Public Schools' School Board, and not the EFM, possessed the power under state law to determine what curriculum would be taught and which texts would be used in the city's public schools. The court had determined that the EFM had irreparably damaged the school district.

102.   **Defendant By**rd-Bennett worked in that time frame to "steer" a $40 million contract to one of the country's biggest educational publishers while she worked for the Detroit schools, according to records obtained by the Chicago Sun-Times which reported that "The court documents obtained Monday also show federal law-enforcement authorities suspected two aides who later worked for CPS helped Byrd-Bennett to rig the bidding process in Detroit in favor of Boston-based Houghton Mifflin Harcourt. In a sealed affidavit from 2013, FBI Special Agent Joseph Richard Jensen told a judge that he believed Byrd-Bennett and her two assistants had collaborated with HMH executive John Winkler to ensure that $40 million in federal stimulus funds would be directed to HMH for the purchase of textbooks for DPS, circumventing the bidding process. Before her tenure at DPS, Bennett-Byrd had worked at HMH as a "superintendent in residency," earning an annual salary of $155,000. According to the FBI, after Byrd-Bennett left DPS, she was re-hired by HMH to work 21 hours per week for $182,000 a year. In his affidavit, Jensen claims that Byrd-Bennett's emails indicate that she and her assistants rigged the request for the proposal process months in advance to favor of HMH. The [federal agent] told the judge an 'unusual financial transaction' took place about three weeks before the contracting process for the Detroit deal began. Records show the FBI's 'analysis of a bank account belonging to Barbara Byrd-Bennett shows a deposit

38

into her Money Market account on July 20, 2009 in the amount of $26,530.26 from 'Houghton Mifflin Harcourt.'"

103.   Upon taking office Defendant Snyder replaced Bobb and appointed defendant Roy Roberts as emergency financial manager of the DPS under PA 72.

104.    When the state legislature repealed PA 72 by passage of PA 4, Defendant Snyder appointed defendant Roberts, as emergency manager of the DPS.

105.   Once passed, both Public Act 4 and Public Act 436 have been applied in a discriminatory manner demonstrating callous indifference to those who had their various constitutional rights removed, including DPS children. Defendant Snyder had also imposed emergency managers on cities with majority or near majority African-American populations, even though there were non-African-American cities with the same or worse "Fiscal Health Score," as defined by defendant State Treasurer Dillon. In Oakland County, defendant Snyder imposed an emergency manager on the City of Pontiac, which has an African American population of 52.1%, but defendant Snyder did not impose an emergency manager in the Oakland County cities of Hazel Park (9.8% African American population), and Troy (4.0% African American population), even though each of these cities had an identical Fiscal Health Score of "6." (http://quickfacts.census.gov; Department of State Treasurer, Fiscal Indicator Scoring Table). This discriminatory pattern in Oakland County was repeated in

other counties and school districts throughout the state.

106.   The Detroit Public Schools is a district comprised of 87% African American and 7% Hispanics students and has, as set forth supra, a long standing history of being a predominantly minority school district. Fifty-nine per cent of DPS children live in homes that are characterized as poverty-stricken according to guidelines established by federal and state standards.

107.   By acts of placing DPS under the control of emergency managers, Defendants Pavlov, Pscholka, and Snyder not only consciously and intentionally violated the rights of the children of DPS, but consciously and deliberately with callous disregard thwarted the will of the majority of Michigan citizens who voted to abolish the position of emergency manager.

108.    Since being taken over by the State under P.A. 72, P.A. 4 and P.A. 436, appointed defendant emergency managers, individually and in their respective official capacities, have acted with recklessness and manifest depraved indifference to the plight of DPS children and the tax-paying citizens of Detroit in matters concerning the educational, financial and physical accommodations of the Detroit Public Schools.  As an example, Defendant BYRD-BENNETT, individually, and in her official capacity as a duly appointed DPS official brokered a forty-million dollar deal for a so-called 'Learning Village Project' that never materialized. Defendant Byrd-Bennett served as the academic and

accountability officer for the DPS. In 2012, federal agents also began investigating defendant Byrd-Bennett's role in the $40 million textbook contract mentioned in paragraph 102, supra that was awarded while she worked in Detroit.

109.  Defendants SNAPP, SMITH, SIMS, PEARSALL, MOORE-PATTON, FLOWERS, BOWMAN, ALEXANDER, BUENDIA, CAMPBELL, GRAVES-HICKS, HEARN, GERIMA JOHNSON, and STANLEY JOHNSON acted at all times pertinent to this litigation as agents of the DPS and under the supervision of defendants ROBERTS, MARTIN AND/OR EARLEY in securing kickbacks for their own personal use from vendors of the DPS in an amount totaling nearly one million dollars.

110.  Defendants ROBERTS, MARTIN AND EARLEY failed to adequately monitor or supervise these co-defendants in securing bribes from DPS vendors, or in the alternative, failed to establish practices and procedures of accountability for the use of Detroit and Michigan taxpayers' money and federal funds to prevent such theft from occurring.

111.  When PA 436 took effect on March 28, 2013, an emergency manager, defendant Roy Roberts, was already in place over the Detroit Public Schools and his title was continued as emergency manager with all the powers granted by the new act.

112.    Under PA 436, Defendant Snyder has appointed three emergency managers over the Detroit Public Schools, defendant Roy Roberts from March 28, 2013 to July 15, 2013, defendant Jack Martin from July 15, 2013 to January 13, 2015 and defendant Darnell Early from January 13, 2015 until the date of his resignation on March 1, 2016. None of these defendants had sufficient professional education or training such that they were qualified to oversee the educational requirements of the largest school district in Michigan.

113.    Under PA 436, elected officials of the DPS were displaced and/or divested of governing and law-making authority and replaced by emergency managers.

114.    Under PA 436, Detroit citizens effectively lost their right to vote for the Plaintiff DPS Board.

115.    Local elected DPS officials were effectively removed from office under PA 436 and this removal occurred without any showing of malfeasance or misfeasance causing or contributing to the financial circumstances faced by the DPS. In so doing, the Act implicitly assumed that these local officials were guilty of corruption or gross incompetence that caused or contributed to the financial circumstances of the DPS. Public Act 436 makes this assumption of guilt and removed DPS elected officials without any finding of fault and without any form of due process. Nowhere in this pattern of selection insofar as the DPS is concerned, was there any mention or acknowledgment that the State of

Michigan, by and through the callous indifference of all defendants, was solely responsible for the financial and educational disasters brought onto the children of the DPS from 1999 to the present.

116.   Two successive State takeovers has moved the Detroit Public Schools away from academic growth and enrollment stability into a profound downward spiral of decreasing test scores, massive enrollment loss, decrepit unhealthy, unsafe school conditions, and impending fiscal catastrophe, all directly and proximately as a result of the callous indifference by all defendants to the rights of the DPS children to obtain a meaningful education.

**Emergency Managers' Acts of Depraved and Callous Indifference to the Educational Needs of Children of the DPS.**

117.   All defendants caused permanent injury to Detroit's children by creating and pursuing policies that drove down academic performances such that the children are permanently damaged in their abilities to pursue a successful adulthood. DPS students lag woefully behind the state proficiency averages for reading, math and science. In fact, based on 2015 national tests, it's arguably the worst performing school district in the entire nation, registering the worst scores of the 21 largest urban school systems in the country.

**High School Graduation Rates**

118.   A peer-reviewed national study shows that students who do not read

proficiently by third grade are four times more likely to leave high school without a diploma than proficient readers. Poverty compounds the problem: Students who have lived in poverty are three times more likely to drop out or fail to graduate on time than their more affluent peers. The study found that one in six children who are not reading proficiently in third grade do not graduate from high school on time, a rate four times greater than that for proficient readers. The rates are highest for the low, below-basic readers: 23 percent of these children drop out or fail to finish high school on time, compared to 9 percent of children with basic reading skills and 4 percent of proficient readers. Overall, 22 percent of children who have lived in poverty do not graduate from high school, compared to 6 percent of those who have never been poor. This rises to 32 percent for students spending more than half of the survey time in poverty. For children who were poor for at least a year and were not reading proficiently in third grade, the proportion of those who don't finish school rose to 26 percent. The rate was highest for poor black and Hispanic students, at 31 and 33 percent respectively. Even among poor children who were proficient readers in third grade, 11 percent still didn't finish high school. That compares to 9 percent of subpar third graders who were never poor. Among children who never lived in poverty, all but 2 percent of the best

third-grade readers graduated from high school on time. The longitudinal study was conducted by Donald J. Hernandez, a professor of sociology at Hunter College and the Graduate Center at the City University of New York, and a senior advisor to the Foundation for Child Development. It was commissioned by the Annie E. Casey Foundation. The study confirms the link between third grade scores and high school graduation and broke down the likelihood of graduation by different reading skill and poverty levels.

119.  The state Center for Educational Performance and Information released graduation rate data for the 2013-14 school year that shows the state's rate, including DPS, was 78.58% while the Detroit Public Schools, alone, had a graduation rate of only 71% for 2013-14.   Three (3) out of every 10 students in the DPS do not make it to graduation.

**The direct relationship between dropping out of high school and imprisonment.**

120. On any given day, about one in every 10 young male high school dropouts is in jail or juvenile detention, compared with one in 35 young male high school graduates, according to a study of the effects of dropping out of school in an America where demand for low-skill workers is plunging. The picture is even bleaker for African-Americans, with nearly one in four young black male dropouts incarcerated or otherwise institutionalized on an average day, the study said. That compares with about one in 14 young,

45

male, white, Asian or Hispanic dropouts. Researchers at Northeastern University used census and other government data to carry out the study, which tracks the employment, workplace, parenting and criminal justice experiences of young high school dropouts. "We're trying to show what it means to be a dropout in the 21st century United States," said Andrew Sum, director of the Center for Labor Market Studies at Northeastern, who headed a team of researchers that prepared the report. "It's one of the country's costliest problems. The unemployment, the incarceration rates — it's scary."

121. The DPS Board became embroiled in a battle over academic control with defendant Roberts. The Board had become increasingly alarmed at the precipitous drop in DPS academic performance, particularly 3rd Grade reading levels. The board voted to pilot a "Race to the Top" research project based at Wayne State University Research Park. The QWK2LRN project developed a rapid turnaround system for low performing schools based on using "large effect size interventions" and instructional technology. QWK2LRN had notable successes at Highland Park and in one of nations lowest performing schools in South Carolina. QWK2LRN presented strong evidence that using large effect size interventions and instructional technology could move Detroit's Priority schools out of

Priority status in one school year. The pilot approach was approved by former E.F.M. Robert Bobb, but was aggressively opposed when defendant Roberts took control of the district.

122. This plan to increase the level of education of Detroit schoolchildren was blocked by defendant Roberts who had no other plan to address the needs of Detroit's lowest performing schools as would be predicted and known by defendant Snyder who chose defendant Roberts to run DPS's educational efforts with full knowledge of defendant Robert's lack of educational background and awareness. Defendant Robert's vociferous opposition to education initiatives by the board was public and documented. Mr. Roberts became infamous for mocking the board by saying. " If a school district tells you that they moved 10% you should call the F.B.I."

123. The testing of levels of achievement has dropped precipitously in the past four years by this do nothing attitude of all defendant emergency managers manifesting a callous indifference to the needs of the children of DPS. All the while, defendants SHY and ALLSTATE SALES were paying kickbacks to the thirteen-named defendant-principals in the approximate amount of $908,518 for the provision of millions of dollars of certified and submitted fraudulent invoices to DPS for payment to SHY for goods that were not delivered. All these transactions occurred during, and ass a result

of, lax policies and procedures condoned and/or ignored by defendant emergency managers

124. The available statistics clearly demonstrate the precipitous falloff in student performance under defendant emergency managers; A recent analysis of the reading and math levels of DPS and EAA students reveals how damaged the DPS children are:

DPS Total Reading

88% DPS 3rd grade are not proficient readers
88% DPS 4th grade are not proficient readers
87% DPS 5th grade are not proficient readers
84% DPS 6th grade are not proficient readers
84% DPS 7th grade are not proficient readers
83% DPS 8th grade are not proficient readers
75% DPS 11th grade are not proficient readers

   i. Math:

DPS Total Math

0% DPS students are advanced in math
89% DPS 3rd grade are not proficient in Math
92% DPS 4th grade are not proficient in Math
100% DPS 5th grade are not proficient in Math
100% DPS 6th grade are not proficient in Math
100% DPS 7th grade are not proficient in Math
100% DPS 8th Grade are not proficient in Math
88% DPS 11th grade are not proficient in Math

   ii. Education Achievement Authority Reading:

EAA Total Reading

48

100% EAA 3rd grade are not proficient readers
100% EAA 4th grade are not proficient readers
95% EAA 5th grade are not proficient readers
100% EAA 6th grade are not proficient readers
90% EAA 7th grade are not proficient readers
92% EAA 8th grade are not proficient readers
94% EAA 11th grade are not proficient readers
0% EAA students are advanced readers

iii.  Education Achievement Authority Math:

EAA Total Math

100% EAA 3rd grade are not proficient in Math
100% EAA 4th grade are not proficient in Math
100% EAA 5th grade are not proficient in Math
100% EAA 6th grade are not proficient in Math
100% EAA 7th grade are not proficient in Math
100% EAA 8th grade are not proficient in Math
100% EAA 11th grade are not proficient in Math
0% EAA students are advanced in Math

iv.  College and Career Readiness:

97% of Detroit's High School students do not meet the state minimum for college and career readiness.

125. The defendants harmed Detroit children by establishing procedures and policies of intentional and/ or callously indifferent neglect that increased the likelihood that they would not be college ready at graduation or that they will become dropouts.

126. Instead, defendant emergency managers permitted untried and untested experiments on children of the DPS.

**Pugh's "Mentoring" Program permitted by the emergency manager**

127.   In a federal district court case charging sexual harassment brought on
behalf of a minor DPS child, Judge David M. Lawson[5] ruled that a Title IX
violation could proceed to trial in the following language; "The record here
establishes, at a minimum, that defendant Roy Roberts had actual
knowledge of Pugh's inclination to engage in inappropriate relationships
with school-age boys, and the DPS defendants have not offered any
evidence that either Roberts or any of the school officials under his
authority took any action to terminate Pugh's access to the students at the
Douglass Academy. Moreover, it appears that, contrary to the district's
policies regarding the volunteer program, Pugh and the members of his
mentorship team never were subjected to any background checks, and
school officials present at the time of the forum meetings made, at best, no
more than token efforts to attend those meetings or to observe Pugh's
behavior toward the students. Roberts's failure to take any action either to
detect or to prevent Pugh's harassment of the plaintiff plainly was
unreasonable in light of his actual knowledge of Pugh's inclinations. That

---

5 K.S. v. Roy Roberts, et al, Case no. 14-12214 before the Honorable David M. Lawson, now
closed, dealt, in part, with the issue of Roy Robert's conduct as emergency manager and
plaintiff's Title IX claim.

evidence is sufficient to create a question of fact on the plaintiff's Title IX claim that warrants jury resolution."

**The disastrous EAA Plan: A Failed Experiment at the Expense of DPS Children at the Cost of Millions of Dollars.**

128. The Education Achievement Authority (EAA) was a controversial plan created by defendant Snyder in 2012 to reform Michigan's lowest-performing schools; a partnership between the state, Detroit Public Schools and Eastern Michigan University (EMU) to administer a number of schools that were taken by the state, removed from DPS, and put into the EAA, which is overseen by the state, with a majority of the board members appointed by the governor and the EM of the DPS, the superintendent of the EAA. The EAA oversees 15 schools — nine charter elementary/middle schools, and six high schools. Once put in place, the EAA's graduation rate for 2013-14 was 61.55%, up from 61.17% in 2012-13, i.e. ten per cent lower than the DPS.

129. There has been much controversy surrounding the EAA, which has been criticized for poor academic performance and declining enrollment. There also has been an FBI investigation into the EAA for alleged kickback schemes involving vendors.

130. Some local school districts have refused to accept student teachers from EMU because of the university's affiliation with the EAA. EMU Student

Body President Steven Cole recently expressed hoped that student teachers will be able to go back to placements in local school districts. "It's encouraging to see that they voted to withdraw from the (EAA) agreement. It's been overdue, a vote we've been asking for," he said. "And the community has been urging for two years now to get out."

131. Defendant Roberts had a serious conflict of interest as he became chairman of EAA's board at the same time as being emergency manager of the DPS all to the detriment of the DPS children.  Because of this conflict, defendant Roberts was forced to remove himself as chairman of the EAA board.

132. The defendant emergency manager(s) provided loans from the Detroit Public Schools to facilitate EAA's startup when at the time DPS was itself in financial difficulty.

133. The emergency manager(s) seized the assets of Detroit Public Schools (15 schools) and moved them to the E.A.A. and gave away substantial DPS assets to private charter schools for nominal sums.

134. Defendants Snyder and Roberts transferred a new Detroit Public School building (Mumford) and moved it to E.A.A before one DPS student had entered the building. This school was funded with a DPS $500 Million bond issue, i.e., approved by the taxpayers of the city of Detroit and intended for use by students of the DPS.

135. Defendant emergency managers created an ongoing advertising campaign that suggested falsely that EEA education was superior to the Detroit Public Schools for the purpose of luring students away from DPS while they were DPS emergency managers and the chairmen of the board of directors to the EAA. More than 11,000 DPS students enrolled in the EAA district. Distinguished education researcher Dr. Thomas Pedroni published his analysis of EAA students test results for 2013. "2013 MEAP cohort data published Friday by the Michigan Department of Education provide a stark contrast to EAA claims, dating back to February 2013, of fantastic student achievement gains on its quarterly performance assessment. Because the cohort data enable MDE to track individual student progress from year to year, they provide us with the most reliable picture of student test performance and test score growth over time.  Unlike proficiency scores that tell us the proportion of students who met MDE's proficiency cut score, cohort data use students' mean scale scores to chart student growth.  Since mean scale scores are based on students' raw test scores, they give us a picture of student achievement test growth even if students have not yet obtained proficiency. The cohort data are especially important because, as the EAA has rightly maintained, students who start out so far behind might take a few years to reach the proficiency cut score,

even if they are making steady progress from year to year.  Thus, while

proficiency rates are not a good measure of whether or not the EAA's

students are progressing on tested curriculum, the cohort data are. So what

do the cohort data tell us? In all, MDE successfully matched 1,377 students

from their 2012 math MEAP performance to their 2013 math MEAP

performance, and 1400 students from their 2012 reading MEAP

performance to their 2013 reading MEAP performance.  The matched math

and reading cohorts, according to MDE, constituted 86.8% and 87.7%

respectively of all 2013 EAA testers on those two tests. The tracking of

those students shows us, convincingly  . . .  that the majority of EAA

students failed to demonstrate even marginal progress toward proficiency

on the State's MEAP exams in math and reading.  Among students testing

this year who did not demonstrate proficiency on the MEAP math exam

last year, 78.3% showed either no progress toward proficiency (44.1%) or

actual declines (34.2%).  In reading, 58.5% showed either no progress

toward proficiency (27.3%) or actual declines (31.2%)."

136.  Defendants  Kenyatta Wilbourn Snapp, Glynis Thornton, MAKING A

DIFFERENCE EVERYDAY, and Paulette Horton conducted their bribery

scheme during this time period depriving DPS/EAA children of monies

intended to be used for educational benefits.

137.   As the EAA miserably failed in its efforts with respect to these children, they are included in the class of DPS children who have had their rights violated by the defendants resulting in damage to their educations such as to impact them for a lifetime.

138.   Defendant Earley resigned in his letter of resignation to Defendant Snyder on or about March 1, 2016 saying that he was terminating his eighteen-month tenure prematurely because the need for an emergency manager had ended, implying that the financial emergency that had precipitated the appointment of emergency managers was over.  However, to the contrary the callous indifference to the constitutional rights of DPS children under defendants' management had run the DPS into imminent financial ruin.

139.   A sweeping federal corruption probe of the E.A.A. reveals the extent to which the depraved indifference and damage to the plight of children of the DPS was allowed to fester by the defendant emergency managers;

      i.   Defendant Snapp, a former Mumford High School principal has stated publicly that she had cut a deal to plead guilty to bribery and tax evasion as part of the FBI probe of kickbacks. On information and belief, a federal prosecutor and/or local prosecutor have charged defendants Thornton and Horton with bribery.

ii. Questionable financial practices characterized in independent financial audits as "material non-compliance with laws and regulations,"

iii. "material weaknesses" in internal control over financial reports and internal control over major programs were found, all under the direct control of the emergency manager defendants.

iv. Thirteen school principals (named as defendants herein) were indicted on March 29, 2016 for receiving a total of approximately $908,518 in kickbacks from defendants SHY and ALLSTATE SALES who fraudulently received millions of dollars through the certification and submission of fraudulent invoices to DPS for payments for good that were not delivered.

v. Defendant FLOWERS, as an example, received kickback payments totaling approximately $324,785 from defendant SHY.

140. Ronald Alexander, principal at <u>Charles L. Spain Elementary</u>, pocketed $23,000 in kickbacks from Shy in exchange for using him as a school supply vendor.

141. Beverly Campbell, of Southfield, a former principal at both Rosa Parks School and Greenfield Union Elementary-Middle School, accepted

$50,000 in cash kickbacks from Shy, who oftentimes never delivered the goods to her school, but got paid anyway with the help of phony invoices signed by Campbell

142.  Gerlma Johnson, former principal at Charles Drew Academy, former principal at Earhart Elementary-Middle School and current principal of Marquette-Elementary Middle School, accepted $22,884 in kickbacks from Shy.

143.  James Hearn of West Bloomfield, principal at Marcus Garvey Academy, accepted $11,500 in kickbacks from Shy.

144.  Tanya Bowman of Novi, former principal at Osborn Collegiate Academy of Math, Science and Technology, accepted $12,500 in kickbacks from Shy.

145.  Josette Buendia of Garden City, principal at Bennett Elementary School, accepted $45,775 in kickbacks from Shy.

146.  Ronnie Sims of Albion, former principal at Fleming Elementary and Brenda Scott Middle School, accepted $58,519 in cash kickbacks from Shy.

147.  Willye Pearsall of Warren, former principal at Thurgood Marshall Elementary School, accepted $50,000 in kickbacks from Shy.

148.  Tia' Von Moore-Patton of Farmington Hills, principal of Jerry White Center High School, accepted $4,000 in kickbacks from Shy.

149.  Clara Smith of Southfield, principal at Thirkell Elementary-Middle School, accepted $194,000 in kickbacks from Shy.

150.  Nina Graves-Hicks of Detroit, former principal of Davis Aerospace Technical High School, accepted $27,385 in kickbacks from Shy.

151.  The first chancellor when the EAA opened in 2012 abruptly resigned in June 2014 after critics raised questions about lackluster academic achievement as well as the district's finances. "When I left the EAA, I had an agreement with them that I would not talk about the authority, which was fine with me," the former chancellor said.

152.  Subpoenas, issued in May and June 2014, also sought records related to various companies named in the subpoenas; Futures Education, a company with offices in Dearborn that provided support services for special education. The EAA told investigators that it didn't have invoices for more than $740,000 from the company, according to the records.

153.  The records also show investigators seeking contracts, invoices and other records related to a wide range of other companies that did business with the EAA. Investigators wanted to see records relating to $114,000 in invoices from a company called Detroit Media Specialists, but the district

attorney wrote to an investigator in July 2014 that "The EAA has no financial records/files related" to the company. The district attorney also told the investigators that the EAA had no records of contracts with defendant Allstate Sales, World Wide Sales, Educating Hands, Gloria P. Davis, Conari Consulting and Learning Gizmos. The district also had no record of almost $1 million in invoices from Educating Hands, Top Flight Education, M.A.D.E. Training, Beyond Basics, Ingrid Walton and Alkebu-Lan Village. All of these issues occurred at the time defendant emergency managers were serving in a supervisory capacity role for the EAA and also running the DPS. While totally unqualified by virtue of their lack of training and education in educational matters, the defendant emergency managers were appointed by defendant Snyder because of their financial backgrounds in business, but said defendants failed to establish policies or procedures with regard to financial transactions that could have prevented and/or detected these fraudulent schemes.

154.    The FBI asked EAA officials specifically about contracts and payments made to Esperanza, a now-defunct nonprofit, and to Follett Educational Services, a textbook company. Records show that the first chancellor of EAA and Cecilia Zavala, Esperanza's former chief operating officer, signed

contracts for Esperanza to provide a conflict resolution program at a handful of EAA schools. An invoice report showed the EAA paid Esperanza $1.6 million in 2012-15.

155. In June 2015, Wayne County prosecutors charged Zavala and a former principal at Western International High School, part of the Detroit Public School District, with embezzling thousands of dollars from Esperanza Detroit. Authorities said the money was supposed to be used to serve at-risk students.

156. Mumford's former business manager, lost her job in 2014 after officials in the district discovered she'd signed off on a $500,000 contract with Pearson, an international educational services company, according to an e-mail directed to a FBI special agent. EAA board approval was required on any contracts over $250,000, and only the chancellor was supposed to sign off on contracts that large, the e-mail said. The school principal said that the woman who signed the $500,000 contract "was not in the right role as business manager," and offered to transfer her to another position so that "this issue would not arise again." The district attorney has written that the woman was reassigned to another job at the school. But that the transfer left the defendant principal Snapp "serving as her own business manager."

157. On Friday, October 10, 2015, EAA Chancellor Veronica Conforme appeared before Wayne County Circuit Judge Lita M. Popke pursuant to an Order to show cause why she should not be held in contempt for the EAA's failure to turn over records revealing details of the specific special-education services provided to district students under a multimillion-dollar deal between the EAA and Futures Education of Michigan. Despite the seriousness of the issues raised in the suit, the EAA failed to provide the records or to file a legal response defending its actions in refusing to respond to a Freedom of Information Act (FOIA) request by Dr. Joshua Tolbert, an education researcher who has been working on special education issues. "The district paid huge sums of taxpayer money to yet another for-profit company that promised to create plans to serve our most vulnerable children–but refuses to reveal those plans or report how successfully they've been implemented," said Ralph Simpson, a cooperating attorney with the ACLU of Michigan, which accused the EAA of violating the state Freedom of Information Act in its lawsuit in Wayne County Circuit Court. "Given the challenges already faced by special-education students, we think the public needs to know exactly how well and effectively the school district and Futures are serving our children." The EAA struck the deal with Futures in 2012, paying out as much as $2

million a year for Futures' services. The deal ended prior to the start of the 2014-15 school year.

**Other Costly Projects Developed and Mismanaged by Defendant Emergency Managers with Calloused Indifference To and Disregard of the Rights of DPS Children.**

158.  Mumford High School was demolished and replaced with a new building at a cost of $56 million. Upon completion in 2012, the new Mumford High School was immediately turned over to the Educational Achievement Authority. The lease amount is for $1 million per year, which will amortize the construction cost at Detroit taxpayer expense in a mere 56 years!

159. Kettering High School, renovated at a cost of $6.9 million was closed in 2012 and remains vacant. Kettering was specially outfitted to service physically disabled students, with one entire wing converted for this purpose.

160. Southwestern High School was closed in 2012 and remains vacant following a Detroit taxpayer $6.5 million bond investment that included revamping the auditorium.

161. The building was then sold by the State for $3 million. The land on which Southwestern stood is in the pathway of what is commonly known as "Snyder's Bridge."

162.  The EAA has benefitted greatly from bond money intended to improve

DPS buildings. Southeastern High School and Central High School both received renovations and repairs amounting to more than $50 million for each building and were taken by the defendant Snyder through his defendant emergency managers to give to the EAA, thus depriving DPS children of the constitutional right to have their educational statuses fully funded, in part, by Detroit taxpaying citizens.

163.  The bulk of the bond money paid by the residents of Detroit to improve their school system was spent between 1999 and 2006 (from the 1994 bond) under the CEO, and from 2009 through 2012 (from the 2009 bond) under emergency manager appointees of the Governor.

164.  For years and even today, the waste of funding has been blamed on the Detroit Public School Board, although the Board played no role in the wasted expenditures incurred by the defendants.

165.  In 2013, there were 87 vacant or underutilized buildings belonging to DPS that were for sale or lease. A total of $78.6 million was spent on improvements or renovations to 83 of those buildings which were then abandoned by the defendant emergency managers. There have been 26 buildings demolished at a cost of $27.4 million.

166.  Another 28 buildings received a total of $295.4 million investment and are now leased to community organizations, the EAA, or charter schools.

167. By 2013, DPS, through defendant emergency manager, had also sold several buildings that received a total $36.4 million in renovations and repairs prior to the sales all at the expense of Detroit taxpayer and to the detriment of DPS children.

**DPS students have fled to charter schools whose standards are worse than the DPS with few exceptions.**

168. The biggest change in district enrollment numbers has an entirely different source – the rapid increase in Charter Schools following the enactment of the charter school law in 1994 (Public Act 362 of 1993).  There was no consideration given to neighborhoods and property values when publicly funded schools were left vacant and open by the State while at the same time funding nearby charter schools, many of which were profit-making enterprises. A Detroit Free Press report sheds light on the question of school governance. "Charter schools are run by management companies, but there are also "boards of directors," roughly analogous to school boards. However, in the case of many charter schools, these ostensibly governing bodies are mere window dressing, a rubber stamp for the appropriation of public money by the businesses in whose interest these schools serve. When even handpicked board members have had enough and demand more transparency and an accounting of where the money is

going, they are usually removed or simply ignored. Case in point is the minutes from a board meeting at the Detroit Enterprise Academy in October, 2010. DEA is a charter school run by National Heritage Academies, an outfit set up in the mid-1990s by J.C. Huizenga, cousin of H. Wayne Huizenga, founder of the huge trash conglomerate, Waste Management Corporation. When asked why he became interested in starting a school, Huizenga quipped, 'I got to thinking about the possibility of opening a charter school that would overlay a business model on top of the education model.' Regarding the for-profit aspect of the enterprise, Nick Paradiso, NHA's vice president pointed to Huizenga's interest in various bond markets. He added while the company does not disclose its financial operations, it started making a profit in 2000. At the 2010 board meeting an exchange took place between a board member and NHA representative Greg Lambert regarding the NHA management fee. The issue in question was a resolution put forward by board members for dual signatures for disbursement from the Detroit Enterprise Academy bank account. In other words, there was a question as to who was withdrawing the money and where was it going. A verbatim segment of the minutes reads, 'There was a discussion regarding the amount of the NHA management fee. Greg Lambert clarified that the entire amount received by

NHA was the management fee according to the contract and that there was no separate item line for a 'management fee.' He stated he would not disclose a specific dollar amount for management fees. The appropriateness of this position was questioned since public money was involved. Mr. Lambert stated that the public dollars became private when they were received by NHA. He further indicated that because NHA is a private company, the information need not be disclosed." The Detroit Free Press also analyzed the files of the Michigan Department of Education and records from charter schools obtained under the Freedom of Information Act.

The documents show NHA:

■ Routinely charges schools rents that experts consider above fair-market value.

■ Charges 14 schools, four in Detroit, more than $1 million each per year.

■ Has collected more than $380 million in rent — including almost $42 million in 2013-14 — since the company opened its first school in 1995. NHA's schools pay separately for utilities, maintenance, insurance and taxes, pushing the costs of their buildings well above what many real estate and education experts consider acceptable.

■ Collected approximately $220 million in taxpayer dollars in 2013-14 from its 47 Michigan schools."

169. Defendant Snyder has paid lip service to increased accountability and transparency for charter schools. As a recent news article states,"Even in the face of documentation of lack of academic performance, transparency and questionable use of one billion dollars a year of taxpayer money, Gov. Snyder removed caps on new charters and his pet project, the Educational Achievement Authority for failing schools."

170. The National Association of Charter School Authorizers, a staunch advocate of charter schools, has deemed Michigan's policies and practices with regard to charter schools a failure.

171. Detroit City taxpayers are currently liable for two bonds, plus interest, for building renovations on school buildings that the district is now leasing to charter corporations that are in direct competition with DPS for student enrollments and tax dollars.

172. Over the past ten years, DPS has shut down nearly two-thirds of their neighborhood schools due to state-created debt. Enrollment in DPS has decreased to fewer than 44,000 students, while enrollment in competing charter schools has increased to over 40,000 students with questionable results insofar as educating students. In the Leona Group of charter schools,

for example, in math proficiency, as measured by the Michigan Educational Assessment Program (MEAP) test, its students scored a 15 percent average, meaning 85 percent of students in the state of Michigan scored higher.

173.   Because of the defendants' callous indifference to the rights and needs of impoverished DPS children. Detroit residents must now pay for buildings that they cannot use for questionable results that many times do not meet even the performance levels of DPS schools.

**Disabled students**

174. In 2011, there were three centralized locations for disabled student parent activities: the largest center was Oakman Orthopedic, for children with differing abilities; Charles R. Drew Transition Center, for disabled young adults 18-26; and the Detroit Day Center for the Deaf. The DPS received federal funding for operation of these schools.

175.   Oakman was in the 90th percentile of capacity. The school had all of the required ADA accommodations for students and special accommodations unique to the school. Oakman allowed siblings of disabled students to attend together creating a vibrant community. It had received multiple awards.  It was closed without an academic, or low enrollment reason for the closure. Defendant Roberts said that the building needed "fixing".

176. Oakman Parents quickly contacted an influential community leader, who tried in vain to persuade defendant Roberts to rethink his decision. He had made up his mind and he let her know that the defendant Snyder stood by him. The leader explained the meeting with Roberts during a break at an EAA Board meeting: "I asked Mr. Roberts about a meeting he had promised me (at the previous EAA meeting in Detroit) to discuss Oakman and why he believed it should close. Even though I approached him in a very polite and professional manner when I told him I was still interested in taking up his offer to meet, he instantly became very hostile. He said his decision was final and he had spoken to the governor about it." Hoping to dispel concerns he had about Oakman, she continued, telling him how unique and special Oakman was.  She told him of the research she did, suggesting perhaps his enrollment numbers were too low and that the repair costs were inflated. Roberts had said at first that the costs of repairs was a fairly small amount. Over a short period of time he made several other statements each time increasing the claimed costs of repairs and it turned out that no estimate for repairs had ever been obtained.

177. The community leader  advised him that two of the schools which students were slated to go to were not even prepared for students with

disabilities, and asked him to reconsider the closing Oakman. "He was unpersuaded. His hostility only seemed to increase. He went on about how maybe I should work for DPS. I told him I already had a job. Finally I asked him, 'So when you said you wanted to meet with me, you lied?' He literally yelled, 'Are you calling me a liar? You're a liar.' He then stormed off the stage."

178. A grandmother of a DPS child most adroitly describes the impact of family life when a school is closed; "It tears the fabric of the community apart when kids who live near one another can't go to school together or study together (because of transportation).   It creates different allegiances, but we want the best we can obtain for our grandchild so we make the hike across town to the closest public school. Some people had money to move out of the district because of the school closures and the community is torn apart by this too.  They were basically pushed out to do right by their children. So you lose neighbors and friends.. . . . If you put too many people in a cage, they will be irritated and unhappy.  You know what happens when you put too many kids in a classroom? The teacher can't teach.  We can't learn like that.  It is inhuman how I've heard Henderson disabled children are treated now. It makes me feel like we are slaves."

179. Henderson Academy was under the direction and control of defendant Flowers at this point in time, and Flowers was taking kickbacks from defendant SHY for alleged sales of products that were never provided for the benefit of Henderson's school children, many of whom were special needs students transferred from the closing of Oakman.

180. Jason Pauling, one of the named plaintiffs, was doing well academically, including in subjects like algebra, at the Detroit Day School for the Deaf at the time that school was closed. He was ultimately moved over to the Jerry L. White facility where an untrained teacher there gave the teenager a coloring book and crayons. Jason's mother persisted in her efforts to improve her son's educational opportunities and, in tragic irony, the boy was enrolled in the Michigan School for the Deaf in Flint, Michigan where he stayed five days a week until June 4, 2015. Jason, deaf since birth, is currently undergoing testing to determine his level of exposure to the deadly effects of lead caused to be present in the drinking water in the City of Flint by the defendant Early in his former position. Jason is currently undergoing testing for potentially dangerous lead levels in his body.

181. Priscilla Sanstead, co-founder of the national teacher's organization BATS says: "Corporate education reformers of today are producing the

same outcomes in Michigan as segregationists who denied people of color equal opportunities during Jim Crow. Corporate education reformers today are targeting Michigan's black and brown children aggressively forcing them into schools far from their community and are subject to the turnover of their education to a business model. Special education students in Michigan are being forced into Charters where staff to meet their special needs is null and void. DPS provides 1442 FTE's for 1594 cognitively impaired students, the EAA provides 13 FTEs for 145 students and Charters in Wayne County provide just 20 FTEs for 469 students. What Snyder is doing is discrimination, do the math!"

**The Terrible Physical Conditions of DPS Schools.**

182. Defendants intentionally-planned and/or callous indifference to the rights and needs of DPS children has left DPS physical facilities in disrepair. During all relevant time periods the named defendant principals of various DPS/EAA were negotiating and taking bribes and kickbacks from vendors thereby robbing DPS/EAA children of the use of money intended for the purpose of advancing their education. Defendants have failed to meet their duty to the parents, students and teachers of Detroit Public Schools allowing DPS facilities to crumble

72

while refusing and failing to repair these dilapidated school facilities.

183. By failing to properly maintain and manage Detroit's public schools, Detroit students have been exposed to dangerous conditions, including black mold, bacteria, freezing cold temperatures in classrooms, rodent and insect infestations, exposed wiring, hazards that could lead to incidents of tripping, and falling debris to name a few. Students are suffering from respiratory illnesses due to the toxic environment.[6]

184. According to the Detroit Federal of Teachers Interim President, Ivy Bailey, the children of Detroit are being "exposed to atrocious, environmental hazards" including "rat and other rodent infestations, crumbling walls, and heat." According to President Bailey, these conditions have only become worse in the last six years. As a result, Defendants have failed to meet their primary function—to provide an environment conducive to teaching and learning. The budgetary issues, coupled with the bribes to defendants, are intruding into the classroom with DPS facilities being allowed to crumble and decay while the bribes pay for items such as expensive automobiles.

185. Spain Elementary-Middle School is an example of the increasing neglect and decay as a result of the actions of the DPS. The pictures

---

[6] American Federation of Teachers, et al, v. Detroit Public Schools, et al 2: 16-cv-10400, currently pending before the Hon. David Lawson, raises the same issues regarding the degraded and unsafe conditions of the Detroit Public Schools

posted of Spain reveal unrepaired gaps in the walls letting in cold air and vermin, elementary schools students clutching themselves for warmth as they walk down the halls, severe water damage in the gymnasium that has remained unrepaired for years causing the gym floor to warp and wave as well as mold and fungus accumulating with trash in the ventilation ducts, and a rat infestation. Meanwhile, defendant ALEXANDER, the principle of Spain, was reaping kickback payments from defendant SHY in the amounts of approximately $23,000.

186. Lakia Wilson, student counselor at Spain Elementary-Middle School, summarized the conditions best in an article entitled "How bad are conditions in Detroit public schools?" Ms. Wilson described the conditions that DPS students are forced to endure as follows: The odorous smell of mold and mildew hits you like a brick wall when you step through the front doors at Spain Elementary-Middle School in Detroit. I have been at Spain for 19 years, first as a first-grade teacher, then, after earning a master's degree in counseling, as a school counselor. When I first started, it was a school any city would be proud to have in its district. Today, it's the poster child for neglect and indifference to a quality teaching and learning environment for our 500

students. The gym is closed because half of the floor is buckled and the other half suffered so much rainwater damage from the dripping ceiling that it became covered with toxic black mold. Instead of professionally addressing the problem, a black tarp simply was placed over the entire area like a Band-Aid. That area of the school has been condemned. The once beautiful pool sits empty because no one has come to fix it. The playground is off-limits because a geyser of searing hot steam explodes out of the ground. What do our kids do for exercise with no gym, playground or pool? They walk or run in the halls. Seriously. Our pre-K through eighth graders move like mall walkers. Exposed wires hang from missing ceiling tiles. Watermarks from leaks abound. Kids either sit in freezing classrooms with their coats on or strip off layers because of stifling heat. How can you teach or learn in conditions like these?

187. Another teacher at Spain Elementary, Patricia Hall, filed a complaint with the Michigan Occupational Safety and Health Administration (MIOSHA) in October 2015 regarding the dangerous conditions in the school, including the inhalation of dangerous mold. For years, DPS allowed the water damage in the gym to go unrepaired and did nothing to remediate the mold that grew as a result.

    a. Ms. Hall complained that the children and employees at Spain

Elementary had been experiencing health concerns similar to symptoms from exposure to black mold spores, including but not limited to respiratory ailments, chronic fatigue, stomach pain, difficulty concentrating, and sore throats.

b. DPS falsely responded to that complaint that it would fix the problem within fifteen days causing MIOSHA to close the investigation.

188. Another egregious example is Osborn High School. At Osborn, photographs show rodent droppings, exposed wiring, unsanitary bathrooms with nonfunctioning equipment and disgusting conditions, exposed leaky pipes, severely water damaged ceilings and floors, fungus growing out of the walls, missing tiles, warped floors, broken windows that have been taped or boarded up, and even bullet holes that have not been repaired.  DFT conducted an on-site examination of that facility on January 13, 2016 and issued a report summarizing the investigation team's findings on January 14, 2016. In that report, the team noted that the building "lacked routine maintenance or major modernization." The team found pest droppings and water damage, including damaged ceiling tiles and missing windows. The team went on to report that the faculty was "universally frustrated by the

temperature extremes (too hot and too cold) throughout the school, broken windows, inoperable water fountains and continued leaks throughout the building." "Several [teachers] commented how demoralizing it was for students to be in an environment that needed so many repairs, pointing out the bullet-ridden windows that have not been replaced in years." Meanwhile, defendant BOWMAN, the principle of Osborn, received on eight occasions kickback payments from defendant SHY in the approximate total amount of $12,500.

189. Particularly alarming, the report described the link between the conditions found in Osborn and the health and safety of the student body: "Students in this school are predominantly African American and research has found that the asthma prevalence is especially high (upwards of 40%) in this population. It is imperative that any asthma triggers such as mold or dirt be addressed immediately to make the environment safe for those students."

190. At Carleton Elementary, teachers posted pictures showing water damage and pieces of tile coming loose and falling off the ceiling. One teacher reported the debris striking a student in the head during testing.

191. Similar conditions were noted at Carstens Academy of Aquatic Science, Detroit International Academy, Gardner Elementary, and

_

Noble Elementary-Middle School.

192. At Dossin Elementary-Middle School, teachers took pictures of rodent droppings, gaps being allowed to exist between windows, and, once again, water damage and mold. Also, desks in some classrooms are not only used for students, but also to hold buckets to catch the rain water dripping from the ceiling.

193. At A.L. Holmes Elementary, the sidewalks are in disrepair and are a potential hazard for those attempting to enter the school.

194. Keidan Special Education Center is infested with mice and bugs with students learning around rodent droppings.

195. Similarly, at Thirkell Elementary-Middle School, the toilets routinely overflow and leak into the preschool room and students and faculty are forced to deal with a severe cockroach infestation.

196. One teacher posted a video of a live mouse running around the halls of Davis Aerospace Technical High School.

197. These problems are not isolated to the schools described above. One teacher, Pam Namyslowski, 4th Grade Teacher at Mann Elementary School wrote a letter to defendant Darnell Earley that was published by the Huffington Post describing the neglect in "[m]any schools." In that letter, Ms. Namyslowski discusses the problems facing DPS: "Many

schools have numerous plumbing problems in the lavatories, drinking fountains and sinks. Many outdated school buildings are crumbling -- roofs, floors, windows, doors and locks that are broken or in desperate need of repair. Far too many classrooms are overcrowded, creating conditions that are not even safe, let alone conducive to learning. [ . . . ] "In the winter, we often work with them in freezing rooms with our coats on. In the summertime, we survive with them in stifling heat and humidity in temperatures that no one should have to work in. We wipe their tears and listen when they are upset. We send food home with them. We encourage them to persevere and to be hopeful about their futures. We celebrate their successes. We comfort them when they experience loss and tragedy. We give up time with our own children to support our students, who we also consider our children. We spend our own money to buy not only learning materials, but things such as uniforms, hand soap, sanitizer and Kleenex. [ . . . ] "We have watched the debt increase to ridiculous, unsustainable levels under state appointed emergency managers, while the conditions we teach in have deteriorated alarmingly. We have been set up to fail in every way. The successes that happen in classrooms every day, both academic and emotional, largely go unseen, and most cannot be measured or displayed

79

on a data wall."

198. Detroit's Mayor, Mike Duggan, recently took a tour of DPS schools. After that tour, Mayor Duggan was quoted describing what he had witnessed: "I saw 4-year-olds in a classroom where it was about 50 degrees . . . . They told me they usually wear their coats until lunchtime, when they warm up a bit ... because there's a part of each day they actually expect to have to wear their coats in the classroom." The Mayor also found a dead rodent and a severely warped gym floor that students were forced to utilize. He described his tour as "deeply disturbing" and "heartbreaking."

199. On January 20, 2016, the City of Detroit Building, Safety Engineering, and Environmental Department released the results of its own inspection of eleven DPS schools, including Spain, Osborn, and Dossin. Those inspections found, on average, fourteen violations of the Detroit Property Maintenance Code per building.

   Of the schools inspected, Cody High School had a staggering thirty violations. These violations included broken windows, insect and rodent infestations, roof leaks and water damage, non-functioning equipment in the bathrooms, obstructions and hazards blocking emergency exiting, a broken boiler, and mold and mildew caused by

80

water damage.

200. The City inspection of Spain Elementary found additional threats to health and safety of the children and teachers. Spain Elementary was the only school to apparently receive an air quality and environmental inspection, even though mold was found at other schools. The result of the air quality inspection at Spain Elementary found "Mold growing under wood flooring in the gym, with possible diffusion of mold spores throughout the building . . . ." In addition, "Evidence of vermin infestation, including fecal matter and carcasses were observed in various rooms." The inspector summarized: "Operations must verify dampers and all ventilation have been closed in the blocked off areas of the building to prohibit mold spores from affecting air quality in the breathing zones of the open areas within this facility. Vermin infestation must be mitigated."

   i. Each inspection noted that DPS had failed to submit an annual "Certificate of Compliance." Under Sections 9-1-35(d) and 9-1-36a of the Detroit Property Maintenance Code, schools must be inspected and any violations of the Code that are found must be corrected on an annual basis. Section 9-1-36a specifically provides that: "It shall be

81

unlawful to occupy or use a building, premises, or structure required to have a certificate of compliance under this article, or cause same to be occupied, without the required certificate of compliance for the building, premises, or structure. Upon the issuance of a blight violation notice and a finding that the building, premises, or structure is unsatisfactory for human habitation, the director of the buildings and safety engineering department or public health director may order such building, premises, or structure vacated." Had DPS followed this process, these health and safety issues should have been exposed and corrected a long time ago.

201. Despite these widely publicized, well documented, and alarming hazards, DPS under defendant Darnell Earley has failed to take action to repair and maintain the public schools.

202. In fact, defendant Earley recently admitted that he knew about the conditions at Spain Elementary a long time ago stating "This did not just happen overnight." Mr. Earley cavalierly acknowledged that "Code violations are not new to Detroit Public Schools." Instead of taking

action to correct the health and safety concerns regarding the water damage in the gym and the mold that grew as a result of it, Earley told school workers to just avoid using the gym because DPS was planning on selling the property to Detroit Medical Center anyway.

203. Sadly, defendant Earley has a pattern and practice of managing public systems in this regard. Prior to his appointment to DPS, defendant Earley was the emergency manager for the City of Flint. During his tenure at the City of Flint, defendant Earley implemented the shift in drinking water from the Detroit Water System District to the Flint River to allegedly decrease costs. That change has also made national news with thousands of Flint residents being exposed to lead poisoning. Even though complaints had been made by local residents during defendant Earley's administration, nothing was done and residents were encouraged to drink the water.

204. Even the DPS spokeswoman, Michelle Zdrodowski, has admitted that school buildings are in "complete disrepair."

205. The impact of Defendants' mismanagement on students has been tragic. The numerous budgetary cuts have led to uninhabitable public schools—some of which should be condemned.

## COUNT I
## VIOLATIONS OF 42 USC 1983

206. Plaintiffs re-allege and re-plead all the allegations of the preceding paragraphs of this Complaint and incorporate them herein by reference.

207. The enactment of PA 4 and PA436 reinforced and continued the ongoing pattern of callous and depraved indifference exhibited by defendants acting under color of state laws to the rights of the children of DPS. The creation of these Acts, the implementation of the Acts, and the criminal acts of accepting kickbacks by various DPS authorities operating under the control and direction of callously indifferent emergency managers, caused /or contributed in one or more of the following ways to the damages suffered by impoverished DPS children:

    i. DPS students have been deprived of a minimally adequate education intellectually, emotionally and physically. Educationally, the downward spiral of testing speaks for itself.

    ii. DPS students have also been damaged emotionally; The damage to children of DPS knowing that they are being treated Jim Crow-like as second class citizens in stark contrast to the surrounding white majority school districts creates scars in their psyches of monumental proportions, teaching them the undeserved lesson that they are lesser

beings than their suburban counterparts.

     iii.  Physically, the physical state of DPS facilities creates terrible obstacles to student learning. Asking a child to learn with steam coming from her/his mouth due to the cold in the classroom, in vermin infested rooms, with ceiling tiles falling from above, with buckets to catch the rain water falling from above, or in buildings that are literally making them sick is more than what is legally or constitutionally tolerable.

208. The physical facilities and buildings of the DPS are in a widespread state of degradation, filth, and unsanitary conditions placing the health of DPS children at high risk, and such status is and was a direct result on the acts or inactions manifest by the depraved indifference to the rights of DPS children by the defendants who deliberately chose to ignore ongoing these ongoing conditions. This is far from the provision of a minimally adequate education as the U.S. and Michigan constitutions require. It is no wonder that DPS students given these conditions, as well as the other effects of austerity and poverty, have the worst achievement results in the country.

209. The pattern of depraved and callous indifference also includes the

transfer of school buildings, students and property out of the DPS (further contributing to the financial deficit), expending funds that could have been used for children of the DPS on various for-profit and non-profit charter schools, the creation of a disastrous experiment in the setting up of the EAA and claiming results that were untrue, attempting to lure unsuspecting parents of DPS children to transfer their sons and daughters away from the DPS and move them to various charter schools without performance standards and (in part) with financial motives; all such acts manifesting a depraved and callous indifference to the rights of DPS children, all acts done by the defendants herein in violation of 42 USC 1983.

210. Throughout vast stretches of the City of Detroit, there are no longer enough schools to accommodate the local student populations in certain neighborhoods, while other areas have TOO MANY schools. Class sizes in the schools that remain have soared to unacceptable levels, and the textbooks and other materials are grossly outdated. An exemplary school that taught aviation and state-of-the-art schools for pregnant girls and for the physically challenged have closed. Art and music courses are pervasively lacking.

## COUNT II:
### Violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C.. 2000 ("Title VI") and section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("section 504").

211. Plaintiffs re-allege and re-plead all the allegations of the preceding paragraphs of this Complaint and incorporate them herein by reference.

212. Federal Funds have been received and used by defendant emergency managers in ways violative of Title VI and Section 504 provisions of federal law.

213. Title VI regulations define the term "federal financial assistance" broadly to include: (1) grants and loans of federal funds, (2) the grant or donation of federal property and interests in property, (3) the detail of federal personnel, (4) the sale and lease of, and permission to use federal property or interest in such property without consideration or at a nominal consideration, and (5) any federal agreement, arrangement, or other contract which has as one of its purposes the provision of assistance. 45 C.F.R. § 80.13(f). Thus, "federal financial assistance" means assistance in the form of any grant, loan, or contract (other than a contract of insurance or guaranty). See 42 U.S.C. § 2000d-4. It does not mean assistance by providing coloring books and crayons to children

capable of performing math at the level of algebra.

214. Title VI prohibits discrimination on the basis of race, color, or national origin in any program or activity that receives Federal funds or other Federal financial assistance. Programs that receive Federal funds cannot distinguish among individuals on the basis of race, color or national origin, either directly or indirectly, in the types, quantity, quality or timeliness of program services, aids or benefits that they provide or the manner in which they provide them. This prohibition applies to intentional discrimination as well as to procedures, criteria or methods of administration that appear neutral but have a discriminatory effect on individuals because of their race, color, or national origin.

215. Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504") prohibits discrimination on the basis of disability by recipients of federal financial assistance.

216. The Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"), prohibits discrimination on the basis of disability whether or not they receive Federal financial assistance. Providers covered by Section 504 and/or the ADA may not deny benefits or services to qualified individuals with disabilities or provide lesser benefits than they provide to others. In general, an individual with a disability is

"qualified" if that person meets the essential eligibility requirements for receipt of services or participation in the program or activity with or without reasonable modification to rules, policies or practices. The purpose of these laws is to ensure that covered programs are as accessible to persons with disabilities as they are to nondisabled individuals. The closings of schools providing special needs services for DPS students and the transfer of disabled students to schools that did not provide special needs services were done in violation of these federal laws.

## COUNT III:
**Violation of 42 U.S.C. Sec. 1983; Equal Protection, Disparate Impact of Statute as Callously Applied Resulting in a Racially Discriminatory Pattern of Voter Dilution; U.S. Constitution Amend. XIV)**

217. Plaintiffs re-allege and re-plead all the allegations of the preceding paragraphs of this Complaint and incorporate them herein by reference.

218. In its Application, The Emergency Manager Law resulted in voter Inequality and a disparate impact on voters in the City of Detroit. Public Act 436 has had a particularly disparate and discriminatory impact on Michigan's African-American voters: 50.4% of the state's 1,413,320 African American residents are now ruled by unelected Emergency Managers, compared to 1.3% of the state's 7,926,454 White residents

now ruled by unelected Emergency Managers.

219. The following is a listing of the percentage of African Americans in Michigan living in jurisdictions ruled by Emergency Managers: Benton Harbor: 89.2%, Detroit (and Detroit Public Schools): 82.7%, Ecorse: 46.4% (the White population in Ecorse is 44%), Flint: 56.6%, Highland Park Schools: 93.5%, Muskegon Heights Schools: 78.3%, Pontiac: 52.1%, and Allen Park: 2.1%. The following is a listing of the percentage of Whites in Michigan living in jurisdictions ruled by Emergency Managers: Benton Harbor: 7%, Detroit (and Detroit Public Schools): 10.6%, Ecorse: 44%, Flint: 37.4%, Highland Park Schools: 3.2%, Muskegon Heights Schools: 16%, Pontiac: 34.4%, and Allen Park: 92.9%.

220. In the Detroit Public Schools, the Emergency Manager has ordered that the elected School Board may serve "[i]n solely an advisory capacity," that charter schools are expanded, unilaterally adopted budgets, rescinded existing contracts, and authorized the levy of taxes (Emergency Manager, Detroit Public Schools, Order No's 2009-2, 2010-26, 2011-EMRR5, 2011-EMRR, 14-18).

221. The pattern of discrimination is also exemplified by what has happened in other school districts. In the School District of the City of Muskegon

90

Heights, the Emergency Manager issued an order "assum[ing] immediate control over all matters of the School District… [and that] the present Muskegon Heights Board of Education will serve in an advisory capacity during the duration of the Emergency Manager's appointment." (Emergency Manager, School District of the City of Muskegon Heights, Order No. 2012-1). Less than two months later, the Emergency Manager issued a 7-year contract to a private contractor, to operate all of the School District's public schools as charter schools. (Emergency Manager, School District of the City of Muskegon Heights, Order No. 2012-9).

222. In the School District of the City of Highland Park, the Emergency Manager unilaterally entered into a contract with the Muskegon Heights School District, and transferred funds from the Public School District to the Public School Academy System. (Emergency Manager, School District of the City of Highland Park, Order No's 2012-02, 2012-01).

223. Conversely, in non-Emergency Manager controlled jurisdictions across the state, voters are allowed to elect local representatives who have full powers and duties. The Royal Oak Charter contains language, typical of Michigan city charters, regarding local self- governance:

"Section 1

The form of government provided for in this Charter shall be known as the Commission-Manager form. There is hereby created a Commission, consisting of a Mayor and six Commissioners, who shall be qualified electors of said City, and who shall be elected in the manner hereinafter specified, shall have full power and authority, except as herein otherwise provided, to exercise all the powers conferred upon the City.

Section 2

The Commission shall constitute the legislative and governing body of said City, possessing all the powers herein provided for, with power and authority to pass such ordinances and adopt such resolutions as they shall deem proper in order to exercise any or all of these powers possessed by said City."

(City of Royal Oak Charter, Chp. 3, Sec's 1,2)

224. In the City of Grand Rapids, Michigan's second largest city, voters elect a city government with full powers and duties pursuant to its City Charter. (Grand Rapids City Charter, Title II, Executive Branch, Title V. City Commission). Likewise, in the City of Warren, Michigan's third largest city, its City Charter provides that the City Council has full legislative authority, and its Mayor has full executive authority. (Warren City Charter, Chp. 5, Chp. 7).

225. The State of Michigan's Treasurer's Office developed a matrix or formula for ranking the fiscal health of Michigan municipalities. Municipalities were assigned a "Fiscal Health Score" on a scale of 0 to

10, with 0 to 4 being "Fiscally Neutral," 5 to 7 being "Watch List," and 8 to 10 being "Fiscal Stress." (MI Dep't, Treas, Fiscal Indicator Scoring). The most recent year the scores were ranked on-line (2009), municipalities were broken down by county. In Oakland County, the State Treasurer gave four cities an identical total score of "6:" Hazel Park (9.8% African American population), Pleasant Ridge (1.9% African American population), Troy (4.0% African American population), and Pontiac (52.1% African American population). And notwithstanding the fact that Hazel Park, Pleasant Ridge, and Troy had identical scores of 6, Pontiac, the majority African American city, was the only city of the five with a fiscal score ranking of 6 to be chosen to receive an Emergency Manager. This discriminatory pattern and practice was repeated in other counties throughout the state as well. In Wayne County, where Detroit, Detroit Public Schools, Highland Park Schools, and Ecorse , all majority minority communities, had Emergency Managers imposed, and all had fiscal scores of 7. But so did Riverview (3.1% African American population).  It has a fiscal score of 7 and the state did not install an Emergency Manager there. Of further relevance is that Van Buren Township (12.03% African American population) and Harper Woods (45.6% African American population)

had fiscal scores of 6, the same as Pontiac, but had no Emergency Managers appointed. In Genesee County, the City of Flint has a fiscal score of 8, and an Emergency Manager was appointed. Of further relevance is that Genesee Township (8.18% African American population) did not receive an Emergency Manager even though it had a fiscal score of 9, a higher score than Flint. Argentine (0.23% African American population) did not receive an Emergency Manager even though it had a fiscal score of 6, equal to Pontiac's score. Davison (1.8% African American population) did not receive an Emergency Manager even though it had a fiscal score of 6, equal to Pontiac's score. Flint Township (16.12% African American population) did not receive an Emergency Manager even though it had a fiscal score of 7, a higher score than Pontiac. And Thetford Township (2.91% African American population) did not receive an Emergency Manager even though it had a fiscal score of 7, a higher score than Pontiac. The Walled Lake Consolidated School District, serves over 15,000 school children (compared to 980 students in Highland Park Schools and 1,112 students in the Muskegon Heights School District, both of which have Emergency Managers), in a suburban area north of Detroit. Recently, the Walled Lake District cancelled classes, and ended bus service,

asking parents to transport their children to school, as the District confronts expenses that are projected to exceed revenues by $10,042,856, for the 2013-2014 school year. This District includes the Cities of Farmington Hills (69.7% White population, 17.4% African American population), Novi, Orchard Lake, Walled Lake, Wixom, and the Townships of Wolverine Lake (95.9% White population, 0.7% African American population), White Lake (96.56% White population, 0.78% African American population), West Bloomfield (84.25% White population, 5.18% African American population), described as an "[a]ffluent charter township in the state of Michigan, within the Detroit metropolitan area. It is known for its large homes and rolling hills. West Bloomfield [Township] was named No. 37 on Money magazine's Top 100 Small Cities in 2012. West Bloomfield is also #6 on the list of 100 highest-income places with a population of at least 50,000 people.", and Commerce (96.73% White population, 0.50% African American population). With a $10 million deficit, class cancellations, and disruptions in bus service, no Emergency Manager has been appointed by the State to govern the Walled Lake Consolidated School District, which has a total average White population of 85.3%.

**COUNT IV:**
**Violation of 42 U.S.C. Sec. 1983; Equal Protection, Equal Dignity Owed to Each Voter Callously Disregarded, U.S. Constitution Amend. XIV**

226. Plaintiffs re-allege and re-plead all the allegations of the preceding paragraphs of this Complaint and incorporate them herein by reference.

227. The locally-elected legislative and executive officials in non-Emergency Manager jurisdictions have full powers and duties as proscribed by their respective charters. Whereas, the locally-elected legislative and executive officials under the control of Emergency Managers do not. The more authority exercised by an Emergency Manager, the less the value of the votes that chose the publicly-elected officials replaced by them.

228. This valuing of one person's vote over that of another runs afoul of the Equal Protection Clause because: "Having once granted the right to vote on equal terms, the state may not by later arbitrary and disparate treatment, value one person's vote over that of another. It must remember that the right of suffrage can be denied by a debasement or dilution of the weight of a citizens' vote just as effectively as by wholly prohibiting the free exercise of the franchise. [ . . . ] [T]he right to vote as the [state] legislature has prescribed is fundamental; and one source of its fundamental nature lies in the equal weight accorded to each vote

and the equal dignity owed to each voter."  Bush v. Gore, 531 U.S. 98, 104 (2000)(emphasis added).

229. In Stewart v. Blackwell, 444 F. 3d 843 (6th Cir. 2006), citing to Bush v. Gore, supra, the Sixth Circuit, which has cited to Bush as controlling authority in at least 14 cases (more than any other Federal Circuit), the court held that: "Echoing long-revered principles, the [Bush] Court emphasized that States, after granting the right to vote on equal terms, 'may not, by later arbitrary and disparate treatment, value one person's vote over that of another.' Id. at 104-105 (citing Harper v. Virginia Bd. of Elections, 383 U.S. 663, 665 (1966)).

230. That is, the right to vote encompasses 'more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise." See also, Hunter v. Hamilton County Bd. Of Elections, 635 F.3d 219, 234 (6th Cir. 2011), quoting Bush v. Gore, 531 U.S. 98, supra (A state may not arbitrarily impose disparate treatment on similarly situated voters). In Reynolds v. Sims, 377 U.S. 533, 555 (1964) the Court likewise held that "[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."

231. This callous disparate and depraved discriminatory impact on voters of

color has resulted in a dilution of the value of the individual's right to vote for locally-elected officials of their choosing.  The value of the individual's right to vote for locally-elected officials is one hundred percent (100%) higher in non-Emergency Manager jurisdictions, which are predominantly White, than it is in Emergency Manager jurisdictions, which are predominantly African American.

232. Justice Douglas' dissent in South v. Peters, 339 U.S. 276 (1950)(adopted by the majority in Reynolds v. Sims, 377 U.S. 533 (1964)) provides that: "There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth. [I]t also includes the right to have the vote counted at full value without dilution or discount."  Id. at 279.

233. The Sixth Circuit has expressly adopted this Equal Protection voter dilution standard.  Stewart v. Blackwell, 444 F. 3rd  843 (6th Cir. 2006), supra.

234. In its application, Public Act 436 has had an injuriously disparate impact on the state's African American population. 50.4% of the state's 1,413,320 African American residents are now ruled by unelected Emergency Managers. And the state's process for selecting the jurisdictions for imposition of Emergency Managers has placed

98

Emergency Managers in majority African American jurisdictions when non-African American jurisdictions had the same or worse fiscal indicator score.

235. In United States v. Carolene Products Co., 304 U.S. 144 (1938), the Court held that the liberty interest under the Fourteenth Amendment incorporates rights under the requirement that no state shall "[d]eprive any person of life, liberty or property without due process of law:" the rights enumerated in and derived from the first eight amendments in the Bill of Rights; and, the right to participate in the political process (e.g., the rights of voting, association, and free speech).

236. The right of voting was upheld by the Sixth Circuit in League of Women Voters of Ohio v.Brunner, 548 F.3d 463 (2008)(also citing to the dignity of each vote requirement in Bush v Gore, supra) where the right to vote was burdened through the state of Ohio's arbitrary voting standards which differed from "county to county, city to city, and precinct to precinct."

237. Public Act 436 violates the Equal Protection Clause because the state's process of selecting jurisdictions for the imposition of Emergency Managers was done with calloused indifference in a arbitrary and discriminatory manner, resulting in the denial of the right of Detroit

voters to participate equally in the voting process and, by extension, to the children of the Detroit Public Schools who have experienced firsthand the ramifications of the dictator-like running of the district.

## COUNT V
**Intentional and/or Grossly Negligent Caretaking of Local, State and Federal Funds Intended for Educational Use of DPS/EAA School Children.**

238. Plaintiffs re-allege and re-plead all the allegations of the preceding paragraphs of this Complaint and incorporate them herein by reference.

239. The Callous Indifference of Defendants Snyder and emergency managers Robeerts, Martin and Earley, as set forth previously in this Complaint, also includes the grossly negligent supervision, and/or monitoring of the use of local, state and federal taxpayer funds in failing to prevent the illegal bribery schemes engaged in by defendant vendors and defendant principals. Other monies are unaccounted for in a grossly negligent patter of indifference with regard to what and how and why money was spent or wasted in the DPS and EAA. Allowing such free use of tax monies and funds intended for educational purposes to be diverted to wasteful and/or illegal bribery schemes in such a callously indifferent manner directly and proximately contributed to the harm suffered by children of the DPS/EAA as set forth in this complaint.

100

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request of this Court the following:

A.     An order certifying the class of Plaintiffs;

B.     An order for trial by jury on the merits of the claims of Plaintiffs and adjudication of compensatory and punitive damages

C.     Attorney fees and costs;

D.     Such other and further relief as this Court may deem necessary or proper.

Respectfully submitted,

/s/ Thomas H. Bleakley
THOMAS   H.   BLEAKLEY,   PLLC
(P23892)
Counsel for Plaintiffs
21957 Shore Pointe Ln.
St. Clair Shores, MI 48080-2362
(313) 640-9900
Tom@BleakleyLegal.com

Dated: _____, 2016

---

## DEMAND FOR TRIAL BY JURY

---

NOW COME the Plaintiffs, by and through their counsel, and demand a trial by jury on all matters so triable.

Respectfully submitted,

10

/s/ Thomas H. Bleakley
THOMAS H. BLEAKLEY (P23892)
Counsel for Plaintiffs
21957 Shore Pointe Ln.
St. Clair Shores, MI 48080-2362
(313) 640-9900
Tom@BleakleyLegal.com

Dated: _____,2016